# 22-751

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

KORISZAN REESE, BRIAN OWENS,

*Plaintiffs-Appellants,*

MIRIAN ROJAS,

*Consolidated-Plaintiff-Appellant,*

CHARLES GARDNER, on behalf of themselves and all others
similarly situated, DOROTHY TROIANO, on behalf of herself and
all others similarly situated, DELORIS RITCHIE,

*Consolidated-Plaintiffs,*

JASON FARINA, on behalf of himself and all others similarly situated,

*Plaintiff,*

—against—

TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY, DBA MTA BRIDGES AND TUNNELS,

*Defendant-Appellee,*

ALLIANCEONE RECEIVABLES MANAGEMENT INC., NEW YORK STATE THRUWAY
AUTHORITY, THE PORT OF AUTHORITY OF NEW YORK AND NEW JERSEY,

*Consolidated-Defendants,*

METROPOLITAN TRANSPORTATION AUTHORITY, TRANSWORLD
SYSTEMS, INC., CONDUENT STATE & LOCAL SOLUTIONS, INC.,
LINEBARGER GOGGAN BLAIR & SAMPSON, LLP,

*Defendants.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## PAGE PROOF BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFFS-APPELLANTS

STEPHEN J. FEARON, JR.
SQUITIERI & FEARON, LLP
305 Broadway, 7th Floor
New York, New York 10007
(212) 421-6492

*Attorney for Plaintiffs-Appellants
Koriszan Reese, Miriam Rojas
and Brian Owens*

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ..................................................... iii

INTRODUCTION................................................................. 1

JURISDICTIONAL STATEMENT............................................. 4

STATEMENT OF THE ISSUES.............................................. 5

STATEMENT OF THE CASE................................................. 5

   1. TBTA's Pre-Cashless Tolling Operations Did Not Allow
      Drivers to Accumulate Unpaid Tolls ................................... 5

   2. TBTA's Cashless Tolling Switch Caused Drivers to
      Accumulate Thousands of Dollars in Fines Due to The Lack of
      Feedback and Delayed Notice........................................... 6

   3. TBTA Assessed Thousands or Tens of Thousands of Dollars of
      Fines on Appellants After They Unintentionally Accumulated
      Violations ................................................................... 9

      A. Mr. Owens........................................................... 9

      B. Ms. Rojas............................................................ 11

      C. Ms. Reese............................................................ 12

   4. TBTA's Fines Unduly Punished Vehicle Owners.................... 13

      A. TBTA's Fines Were Implemented to Deter Violations.......... 13

      B. TBTA's Fines Benefitted TBTA's Bottom-Line at the
         Expense of Unwitting Toll Violators ............................ 15

      C. TBTA's Fines Harmed Unsuspecting Toll Violators
         Without Promoting Safety and The Fines Vastly Exceed
         the Actual Collection Costs....................................... 17

      D. TBTA Has a Waiver Matrix That It Does Not Affirmatively
         Disclose to Alleged Toll Violators................................ 21

PAGE

5. District Court Proceedings .............................................. 21

STANDARD OF REVIEW.................................................... 23

SUMMARY OF ARGUMENT................................................. 24

ARGUMENT ................................................................... 25

1. The District Court Erred by Granted Summary Judgment for TBTA on Appellants' Eighth Amendment Claim ................... 25

   A. The District Court Properly Concluded that TBTA's Fines Are Subject to Eighth Amendment Scrutiny ..................... 26

   B. The District Court Improperly Weighed the *Bajakajian* Factors to Find that TBTA's Fines Are Not Grossly Disproportional to Appellants' Underlying Toll Violations .... 28

      i. When Weighing the First *Bajakian* Factor, The District Court Failed to Consider the Switch to Cashless Tolling's Role in Causing Appellants' Unintentional Violations ...................................................... 28

      ii. When Weighing the Third *Bajakajian* Factor, the District Court Erred by Determining That Appellants Were Not Assessed With, and Did Not Pay, Maximum Fines.......................................................... 31

      iii. When Considering the Fourth *Bajakajian* Factor, the District Court Erred by Crediting TBTA's Sham Calculations and By Ignoring Evidence Demonstrating That The Harms Caused By Appellants' Violations Did Not Warrant TBTA's Excessive Fines ....................... 34

2. The District Court Erred By Granting Summary Judgment for TBTA on Appellants' Unjust Enrichment Claim.................... 38

CONCLUSION................................................................. 41

# <u>TABLE OF AUTHORITIES</u>

PAGE(S)

## Cases

*Austin v. United States*,
    509 U.S. 602 (1993) ............................................................ 27

*CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*,
    735 F.3d 114 (2d Cir. 2013) ...................................... 23, 24

*Delaney v. Bank of Am. Corp.*,
    766 F.3d 163 (2d Cir. 2014) ........................................... 23

*Farina v. Metro. Transit Auth.*,
    409 F. Supp. 3d 175 (S.D.N.Y. 2019) ........................ *passim*

*Hudson v. United States*,
    522 U.S. 93 (1997) ......................................................... 25

*Knight First Amend. Inst. at Columbia Univ. v.*
    *United States Citizenship & Immigr. Servs.*,
    No. 20-3827, 2022 WL 1193999, 32 F. 4th 124 (2d Cir. 2022) ........ 23

*Newbro v. Freed*,
    No. 06-1722-CV, 2007 WL 642941 (2d Cir. Feb. 27, 2007) ............ 38

*Timbs v. Indiana*,
    139 S. Ct. 682 (2019) ..................................................... 25

*Tsinberg v. City of New York*,
    2021 WL 1146942, No. 20 Civ. 749 (S.D.N.Y. Mar. 25, 2021) ........ 37

*United States v. Bajakajian*,
    524 U.S. 321 (1998) ................................................. 25, 29

*United States v. Viloski*,
    814 F.3d 104 (2d Cir. 2016) ............................ 24, 25, 26, 28

*Von Hofe v. U.S.*,
    492 F.3d 175 (2d Cir. 2007) ................................ 24, 26, 27

*Vt. Teddy Bear Co. v. 1-800 Beargram Co.*,
    373 F.3d 241 (2d Cir. 2004) ........................................... 23

PAGE(S)

**Statutes**

28 U.S.C. § 1291 ...................................................................... 4

28 U.S.C. § 1331 ...................................................................... 4

28 U.S.C. § 1332(d), Class Action Fairness Act ............................... 4

28 U.S.C. § 1367 ...................................................................... 4

42 U.S.C. § 1983 ...................................................................... 22

**Rules**

Fed. R. Civ. P. 30(b)(6) ...................................................... 15, 36

**Regulations**

15 NYCRR § 127.14 ................................................................. 13

21 NYCRR § 1021.3 ................................................................. 27

21 NYCRR § 1021.3(b) ............................................................. 13

**Constitutional Provisions**

U.S. Constitution Eighth Amendment ...................................... *passim*

U.S. Constitution Fourteenth Amendment ...................................... 25

iv

Plaintiffs-Appellants Brian Owens, Mirian Rojas, and Koriszan Reese respectfully submit this brief in support of their appeal from the District Court's Opinion and Order granting summary judgment for Defendant-Appellee Triborough Bridge and Tunnel Authority (the "TBTA") on Appellants' claims for violation of the Eighth Amendment's prohibition against excessive fines and for unjust enrichment.

## INTRODUCTION

This case challenges the constitutionality of TBTA's cashless tolling fines. Beginning in 2016, TBTA implemented the cashless tolling program on toll crossings throughout New York City, removing prior infrastructure including manned toll booths and toll gates. As TBTA was eliminating toll booths and gates, TBTA knew that problems could arise without the booths, crossbars, and instant feedback indicators that had previously notified drivers of inadequate E-ZPass account balances and other problems. Drivers with insufficient balances or faulty E-ZPass tags now crossed bridges and tunnels for sustained durations while unknowingly accumulating many violations, and TBTA charged those drivers multiple $50 or $100 fines for weeks or longer without alerting them of any issue.

TBTA's lack of instant feedback and its delayed notice meant that unsuspecting drivers, including Appellants, could accumulate thousands or tens of thousands of dollars in fines without knowing of any issues with their E-ZPass

1

accounts or toll billings. For example, TBTA delayed sending notices to Ms. Rojas for weeks after her initial toll crossing, meaning she accumulated tolls and $4,000 in fines. Similarly, Mr. Owens accumulated tens of thousands of dollars in fines because TBTA did not notify him that the electronic components in his car's windshield were blocking TBTA's E-ZPass tag reading equipment. Ms. Reese similarly accumulated fines because TBTA did not tell her that her car had an invalid E-ZPass tag. Although Appellants acted unknowingly and ultimately paid their underlying tolls, TBTA punished them by imposing thousands of dollars of fines, threats (and actual) vehicle registration suspensions, and aggressive collection efforts. TBTA also forced Appellants into a grossly one-sided bargaining process whereby TBTA withheld information regarding internal settlement guidelines and minimum fine payments.

To support its motion for summary judgment, TBTA argued that the fines were warranted because of TBTA's toll violation collection costs. However, Appellants produced deposition testimony and supporting documents establishing that TBTA had artificially inflated its cost calculations by hundreds of millions of dollars per year as a basis for that argument. Appellants also submitted competing evidence that the fines imposed by TBTA were multiples higher than the TBTA's true collection costs. TBTA argued that it had incurred as much as $62 to collect unpaid tolls due to violations, but Appellants produced evidence showing that

TBTA's true costs were approximately $1-$2 per toll violation, far less than TBTA had suggested and a significant enough difference that the District Court should not have decided who was correct.

Whether TBTA's fines were grossly disproportional to Appellants' underlying toll violations is a fact-laden question that should have been presented to a jury. In weighing the relevant factors for Appellants' claim for violation of the Eighth Amendment's prohibition against excessive fines, the District Court discounted Appellants' lack of culpability, improperly credited TBTA's hollow assertions of harm, and ignored sham accounting undercutting TBTA's credibility and raising a question of fact regarding the purported harm stemming from Appellants' toll violations. Appellants provided compelling evidence establishing a genuine issue of material fact for their claims, and the District Court should not have resolved the claims on a motion for summary judgment.

This Court should reverse the decision below and remand the case for further proceedings.

## **JURISDICTIONAL STATEMENT**

The District Court had federal question subject matter jurisdiction over this action and supplemental jurisdiction over Appellants' state law claim. 28 U.S.C. 1331, 1367. The District Court also had diversity jurisdiction under the Class Action Fairness Act. 28 U.S.C. 1332(d). Am. Compl. at ¶¶ 7-9, 67-85, ECF 156 (JA___).[1]

Appellate jurisdiction over this action arises under 28 U.S.C. § 1291. On March 10, 2022, the District Court, Southern District of New York (Castel, J.), granted TBTA's motion for summary judgment on Appellants' claims. (SA 34). On March 11, 2022, the Clerk entered judgment for TBTA. (SA 35). Appellants timely filed their Notice of Appeal on April 11, 2022. Notice of Appeal, ECF 231 (JA___).

---

[1] References to "JA__" are to the Joint Appendix and references to "SA" are to the Special Appendix. "¶ SDMF ___" refers to paragraphs in Plaintiffs' Statement of Disputed Material Facts which begin at JA___ (and unredacted beginning at JA___). Deposition transcript excerpts are additionally cited by the witness's last name and the transcript page and line number (*e.g.*, "Owens Tr. 24:2-4"). Emphasis is Appellants' unless otherwise noted.

## STATEMENT OF THE ISSUES

1.     Whether the District Court improperly granted TBTA's motion for summary judgment on Appellants' claim against TBTA for violating the United States Constitution's prohibition against excessive fines when Appellants were assessed and paid hundreds or thousands of dollars in fines stemming from unintentional toll violations that they had accumulated while using TBTA's newly implemented cashless tolling system.

2.     Whether the District Court improperly granted TBTA's motion for summary judgment on Appellants' claim against TBTA for unjust enrichment when Appellants unintentionally accumulated and paid fines under protest and under the threat of the loss of property interests.

## STATEMENT OF THE CASE

### 1.     TBTA's Pre-Cashless Tolling Operations Did Not Allow Drivers to Accumulate Unpaid Tolls

TBTA owns and operates nine bridges and tunnels throughout New York City. SDMF ¶¶ 8-9, ECF 203 (JA___).[2] Prior to cashless tolling, TBTA manually collected tolls using manned booths and by taking physical payment. With manual toll collection, drivers who could not pay tolls were either turned around at the

---

[2]     The Henry Hudson Bridge, Robert F. Kennedy Bridge, Bronx-Whitestone Bridge, Throgs Neck Bridge, Queens Midtown Tunnel, Hugh L. Carey Tunnel, Verrazano-Narrows Bridge, Cross Bay Veterans Memorial Bridge, and Marine Parkway-Gil Hodges Memorial Bridge.

5

crossing or were given a bill for later payment. In either instance, when a driver came to the crossing and was unable to pay, TBTA told the driver right away that he or she had not paid the toll. *Id.* at ¶¶ 12-13, ECF 203 (JA___).

In the 1990s, TBTA implemented the E-ZPass program. Through the E-ZPass program, a driver established and maintained a prepaid account and received an E-ZPass tag. As an E-ZPass driver's vehicle entered the toll lane at the bridge or tunnel, an antenna would read the tag and the associated account would be charged. *Id.* at ¶¶ 14-15, ECF 203 (JA___).

The E-ZPass program originally had toll booths and gates rigged with E-ZPass reading equipment. E-ZPass users knew whether their accounts were funded or if there was a problem because the toll booths and the gates denied entry or had feedback indicators warning of a low or zero E-ZPass account balance. TBTA instantly alerted drivers to any issues when they passed through toll crossings. *Id.* at ¶ 16, ECF 203 (JA___).

## 2. TBTA's Cashless Tolling Switch Caused Drivers to Accumulate Thousands of Dollars in Fines Due to The Lack of Feedback and Delayed Notice

By the end of 2017, however, TBTA's bridges and tunnels had fully converted to cashless tolling. TBTA removed manned toll booths, toll gates, and feedback indicators and, instead, replaced that infrastructure with "gantries" that would read passing vehicles' E-ZPass tags and license plates. *Id.* at ¶¶ 17, 19-20, ECF 203

(JA___). As TBTA itself acknowledged, without feedback indicators or crossbars at toll crossings, a driver with a defective E-ZPass or a low or negative account balance could cross TBTA's bridges and tunnels without TBTA notifying the driver of the problem, sometimes for weeks or months. *See id.* at ¶¶ 18, 31-35 ECF 203 (JA___) ("Commissioner Pally asked how customers will know whether their E-ZPass has a low balance or insufficient funds since ORT [Open Road Tolling] eliminated gates and driver feedback indicators.").[3]

As TBTA anticipated, TBTA's cashless tolling switch adversely impacted unsuspecting drivers who accumulated thousands of dollars in unpaid tolls and violations because TBTA failed to notify them of problems directly at toll crossings. *Id.* at ¶¶ 31-35, ECF 203 (JA___). Without notice from TBTA, Appellants and other drivers crossed TBTA's bridges and tunnels for weeks or months believing that tolls were paid or that they would receive toll bills. Instead, each time the driver crossed through a toll, and without warning or notice from TBTA, TBTA would impose a fine of $50 or $100 (depending upon the bridge or tunnel), leading to multiple violations and substantial fines. *Id.* at ¶¶ 34-35, ECF 203 (JA___).

---

[3]     TBTA attempted to remedy the lack of immediate feedback by implementing mobile alerts to inform drivers of low E-ZPass balance. TBTA's alert system has a 20% participation rate, meaning that 80% of E-ZPass users are not enrolled in the program. SDMF ¶ 32 n.5, ECF 203 (JA___).

TBTA did not have a system to identify E-ZPass account holders or vehicle owners and lessees who were experiencing unusual account activity such as a large increase in the number of violations or a large increase in the amount of fees. *Id.* at ¶ 36, ECF 203 (JA___). Although E-ZPass customers provide (and TBTA's third-party administrator maintains) contact information for E-ZPass account holders, TBTA did not individually contact customers who were incurring multiple fines. For example, during its deposition, TBTA's representative could not identify any efforts—besides the automatic mailings (sometimes weeks later)—to individually contact Appellants even as TBTA was charging Appellants thousands of dollars in fines. *Id.* at ¶¶ 38, ECF 203 (JA___).

TBTA also failed to affirmatively inform toll violators of TBTA's internal settlement waiver matrix that set forth TBTA's policies for waiving and reducing fines, and TBTA failed to disclose to drivers that TBTA could waive fines or reduce them by up to 80%. *Id.* at ¶ 39, ECF 226 (JA___). Instead of disclosing the settlement matrices and the reduced fine amounts, TBTA assessed toll violators with the full amount of fines and only disclosed the settlement amounts if the toll violator disputed the amount of fines owed. *See id.* at ¶ 39, ECF 226 (JA___).

3.    **TBTA Assessed Thousands or Tens of Thousands of Dollars of Fines on Appellants After They Unintentionally Accumulated Violations**

A.    **Mr. Owens**

Mr. Owens owns and manages businesses that operate three Manhattan restaurants. *Id.* at ¶ 51, ECF 203 (JA____). Mr. Owens opened his E-ZPass account in 2005. From 2005 until February 2017, Mr. Owens paid his E-ZPass account through automatic replenishment and <u>never</u> had a toll violation. *Id.* at ¶ 52, ECF 203 (JA____).

Starting in February 2017 (shortly after the Queens Midtown Tunnel converted to cashless tolling and after Mr. Owens leased a new Tesla) and continuing through June 2019, TBTA assessed Mr. Owens with 439 violations primarily for his use of the Queens Midtown Tunnel. *Id.* at ¶ 53, ECF 203 (JA____). Unbeknownst to Mr. Owens, his properly placed E-ZPass transponder was not being read while he was passing through TBTA gantries because the electronic components in his windshield were interfering with TBTA's E-ZPass tag reading equipment. *Id.* at ¶ 54, ECF 203 (JA____). TBTA never contacted Mr. Owens, even as TBTA was imposing tens of thousands of dollars of fines on him and even though TBTA had Mr. Owens's contact information. *Id.* at ¶ 55, ECF 203 (JA____).[4]

---

[4]    Prior to cashless tolling, Mr. Owens had similar issues with a Tesla model, but he was not able to pass the toll gate and remedied the issue at the toll booth with assistance from TBTA officers. After TBTA implemented cashless tolling, it eliminated that immediate feedback. SDMF ¶ 55 n.7, ECF 203 (JA____).

On September 13, 2019, the TBTA police stopped Mr. Owens as he was exiting the Queens-Midtown Tunnel. Mr. Owens was shocked to learn from the police that TBTA had suspended his registration because he had allegedly failed to pay tolls and tens of thousands of dollars in fines. The TBTA police impounded Mr. Owens' car and left Mr. Owens and his wife at a nearby gas station. *Id.* at ¶ 56, ECF 203 (JA____).

TBTA imposed massive fines even though Mr. Owens' violations occurred due to TBTA's failure to read a functioning and funded E-Z Pass tag. TBTA did not previously tell Mr. Owens that there was an issue with his E-Z Pass tag or account, and Mr. Owens justifiably believed that toll payments were automatically charged to his credit card as they had been since he enrolled in the E-Z Pass program in 2005. *Id.* at ¶¶ 57, ECF 203 (JA____). Moreover, Mr. Owens testified that he did not recall ever seeing correspondence relating to outstanding tolls and toll violations. *Id.* ¶¶ 57, ECF 203 (JA____).

Between February 2017 and June 2019, TBTA imposed 439 violations on Mr. Owens, imposing the maximum fee of $100 or $50 for a cumulative amount of $43,550. *Id.* at ¶¶ 58, ECF 203 (JA____). Upon learning about the unpaid tolls and fines, Mr. Owens took immediate action to remedy the issue and to retrieve his vehicle from the impound lot, including by communicating with TBTA's customer service center. *Id.* at ¶¶ 59, ECF 203 (JA____).

Mr. Owens paid $8,170 in fines and $3,810 in tolls to TBTA. In September or early October 2019, Mr. Owens—who had his registration suspended and vehicle impounded by TBTA because of the fees TBTA had assessed—also paid $1,339.16. to recover his vehicle. *Id.* at 60, ECF 203 (JA____). According to violation citation details provided by TBTA, Mr. Owens paid TBTA the full $100 or $50 fine for eighty-four violations. *Id.* at ¶ 61, ECF 203 (JA___).

### B.  Ms. Rojas

At the time relevant to Ms. Rojas's violations (October 2016-March 2018), Ms. Rojas' husband, Frank Cerquin, drove Ms. Rojas's leased Honda. *Id.* at ¶ 40, ECF 203 (JA___). Mr. Cerquin opened and managed an E-ZPass Account during the time of Ms. Rojas's violations. *Id.* at ¶ 41, ECF 203 (JA____). Mr. Cerquin testified that he had added Ms. Rojas's Honda Civic to his E-ZPass Account when the Honda Civic was leased, and he checked and paid his E-ZPass account before crossing bridges and tunnels. *Id.* at ¶ 42, ECF 203 (JA___).

In April 2018, after seeing a notice of violation, Ms. Rojas discovered that she had accumulated thousands of dollars in fines and associated unpaid tolls from TBTA for toll violations stemming from Mr. Cerquin's use of the Honda Civic. *Id.* at ¶ 43, ECF 203 (JA___). Until April 2018 TBTA and its third-party debt collector were mailing violation notices to Ms. Rojas's prior address. *Id.* at ¶ 54, ECF 203 (JA___).

TBTA assessed Ms. Rojas fines for toll transactions weeks or months after they occurred and without alerting Ms. Rojas or Mr. Cerquin to problems with their toll payments. The toll crossing associated with the first violation occurred in February 2017, but TBTA did not mail the initial violation notice until May 2017. *Id.* at ¶ 45, ECF 203 (JA___).

Upon learning about the unpaid tolls and fines, Ms. Rojas took immediate action to remedy the issue, including Ms. Rojas or Mr. Cerquin making numerous phone calls to TBTA's customer service center or to TBTA's collections agency. *Id.* at ¶ 46 ECF, 203 (JA____).

Between February 2, 2017 and January 31, 2018, TBTA assessed Ms. Rojas with $4,000 in fines for crossing TBTA bridges, assessing the full $50 or $100 fine for each crossing. In September 2019, Ms. Rojas paid TBTA $720 in fines and $347.40 in unpaid tolls. *Id.* at ¶¶ 47-48, ECF 203 (JA___).

### C.    Ms. Reese

In June 2018, Ms. Reese moved to her current address in the Bronx. Until December 2018, TBTA issued some Tolls-By-Mail bills and notices of violation to Ms. Reese's prior address. *Id.* at ¶ 62, ECF 203 (JA___).

Ms. Reese's toll violations primarily stemmed from the use of an invalid E-ZPass tag by a friend who had borrowed her car. TBTA did not notify Ms. Reese that there was a billing issue with using TBTA's toll crossings. *Id.* at ¶ 63, ECF 203

(JA_____); Bressler Dec., Ex. 26 (ECF 194-26). Instead, between August 2017 and November 2018, TBTA assessed $1,000 in fines against Ms. Reese. Upon learning about the unpaid tolls and fines, Ms. Reese took immediate action to remedy the issue, including making numerous phone calls to TBTA's customer service center or to TBTA's debt collector. SDMF ¶¶ 64, ECF 203 (JA___). In September 2019, Ms. Reese paid TBTA (through its debt collector) $500 in fines and $85 in tolls. According to a violation citation detail provided by TBTA, Ms. Reese paid TBTA the full $100 fine for five violations. *Id.* at ¶¶ 65-66, ECF 203 (JA_____).

### 4. TBTA's Fines Unduly Punished Vehicle Owners

#### A. TBTA's Fines Were Implemented to Deter Violations

TBTA assessed a $50 or $100 fine against Appellants for each toll violation depending on the bridge or tunnel that had been crossed. 21 NYCRR 1021.3(b). *Id.* at ¶ 69, ECF 203 (JA_____).[5]

---

[5] Under New York DMV regulation, the DMV may suspend a vehicle registration where the vehicle's registrant accumulates "three or more notices of violation . . . within a five-year period." *See* 15 NYCRR 127.14. TBTA selects the top toll violators from a potential list, looks at accounts to ensure the account is eligible for suspension, and submits the registrant to the DMV for registration suspension. SDMF ¶¶ 85, ECF 203 (JA_____). TBTA viewed the Vehicle Registration Suspension Program as another important enforcement mechanism and worked to achieve registration suspension reciprocity with Massachusetts, Connecticut, New Jersey, Pennsylvania, and Connecticut. *Id.* at ¶ 86, ECF 203 (JA_____).

Mr. Owens' unpaid tolls ranged from $8.00-$9.50. Ms. Rojas's unpaid tolls ranged from $8.00 to $8.50. Ms. Reese's unpaid tolls were $8.50. By contrast, TBTA's fines were either $50 or $100, or more than five times to ten times greater than each underlying toll. *Id.* at ¶¶ 70-71, ECF 203 (JA____).

TBTA's fines secure compliance and deter future violations. The TBTA Board Action Item to obtain TBTA Board Approval to adopt the $50 administrative fee's stated: "the Board authorized the President or his designee to take the preliminary steps necessary to adopt a new regulation imposing an administrative fee, known as a toll violation fee, . . . for the purpose of encouraging its customers to . . . otherwise comply with Authority toll collection regulations[.]" *Id.* at ¶ 72, ECF 203 (JA____).

TBTA increased its fines to $100 on certain crossings to strengthen toll enforcement, deter violations, and to increase TBTA's revenue. The TBTA Board Action Item to obtain TBTA Board Approval to adopt the $100 fine stated: "[i]t is anticipated that increasing the violation fee to $100.00 per violation at the Bronx-Whitestone, Robert F. Kennedy, Throgs Neck and Verrazano-Narrows Bridges and the Hugh L. Carey and Queens Midtown Tunnels and strengthening the Authority's toll violation enforcement procedures will increase toll revenue at Authority Open Road Tolling facilities by deterring toll evasion [.]" *Id.* at ¶ 73, ECF 203 (JA____).

TBTA (by its FRCP 30(b)(6) representative) testified that TBTA imposes violation fees "to disincentivize the customer from violating in this case to keep an account funded." *Id.* at ¶ 74, ECF 203 (JA___) (citing Bressler Tr. 273:15-23, ECF 227-2 (JA____)); *see also id.* at 275:14-16, ECF 227-2 (JA___) ("[T]here was an expected change in customer behavior that they would not violate going forward and comply[.]"); *see also id.* at 276:8-14, ECF 227-2 (JA___) ("To pay the toll in the time, manner, and place that TBTA prescribes and what that means is to pay the toll upon billing of the first toll bill or to keep their E-ZPass account sufficiently funded, so that the transaction is posted based on the E-ZPass tag."). Furthermore, TBTA's Vice President and CFO Mildred Chua stated: "fees are set by the Board primarily to deter toll evasion because the goal is to have our customer pay their tolls when they are due." SDMF ¶ 75, ECF 203 (JA___).

## B. TBTA's Fines Benefitted TBTA's Bottom-Line at the Expense of Unwitting Toll Violators

Although TBTA asserted before the District Court that its fines are designed only to recover revenue, TBTA (by its FRCP 30(b)(6) representative) could not identify how it determined that $50 or $100 fines would be revenue neutral and could not clearly identify who determined that the violation fees should be set at $50 or $100 to keep fines revenue neutral. *Id.* at ¶ 82, ECF 203 (JA___). Furthermore, TBTA could not identify any document other than one prepared for this litigation

(discussed further below) determining the cost of collecting each outstanding toll violation. *Id.* at ¶ 90, ECF 226 (JA___).[6]

Contrary to TBTA's assertion, TBTA earned substantial additional revenue from fines while Appellants were unknowingly accumulating violations. The January 2018 TBTA Committee Meeting Minutes stated that "as of December 2017 . . . Cashless Tolling facilities have collection rates, including tolls and violation fees, through June 2017 <u>above 100%</u>." *Id.* at ¶¶ 76-77, ECF 203 (JA___). Likewise, TBTA stated that as of January 2018, "all facilities . . . through July 2017 have collection rates, including tolls and violation fees, above 100%, with the exception of the Verrazano-Narrows Bridge which went live in early July 2017 and is at 98.4%. In total, the combined collection rate for all facilities that went live through July 2017 is <u>at 101.1</u>%." *Id.* at ¶ 78, ECF 203 (JA___).

Furthermore, because cashless tolling collection involves a Tolls-By-Mail billing process that takes time to mature, when TBTA reviewed revenue collection over a greater length of time (i.e., a year), collection rates substantially improved and demonstrated that fines are for a profit center for TBTA. *Id.* at ¶ 79, ECF 203 (JA___). In August 2018, for example, TBTA stated: "[a]s of August, our overall facility-wide collection rate is at 100.4% for tolls transacted six months earlier . . . .

---

[6]     As discussed below, however, that document artificially inflated purported collection costs to justify the enormous, and multiple, fines that TBTA imposed here

However, when looking back at collection rates 10 months (October 2017) and 12 months (August 2017) earlier, the overall facility-wide collection rates are at 102.5% and 103.7%, respectively." *Id.* at ¶ 80, ECF 203 (JA___).

TBTA's Final Review of 2018 Year-End Operating Results showed substantially greater than expected fine revenue and lower than expected toll processing costs: "Other Operating Revenue totaled $23.9 million, which was $5.0 million above the Final Estimate primarily due to higher than anticipated revenue from E-ZPass and Tolls by Mail fines;" "Other Business Expenses were $5.2 million below the Final Estimate primarily due to lower than anticipated toll collection processing costs." *Id.* at ¶ 81, ECF 203 (JA___). Stated differently, cashless tolling fines increased TBTA's projected bottom line by $10 million in 2018, the year Appellants accumulated the bulk of their fines.

**C.    TBTA's Fines Harmed Unsuspecting Toll Violators Without Promoting Safety and The Fines Vastly Exceed Actual Collection Costs**

TBTA's fines did not improve safety for drivers or the tolling system. *Id.* at ¶ 83, ECF 203 (JA___); *see also* Bressler Tr. 127:9-12, ECF 227-2 (JA___) ("Q: But the violation fee itself wasn't intended to improve safety. Is that right? A: To my knowledge, no."); *Id.* at 127:22-128:4, ECF 227-2 (JA___) ("Q: The violation fee imposed by TBTA was not intended itself to improve safety correct? A: That is my understanding. Correct"). Furthermore, TBTA's Safety Reports generally focus on

collision rates and make no mention of TBTA's fines or outstanding violations as impacting safety. SDMF ¶ 84, ECF 203 (JA___).

TBTA's fines far exceeded the cost of collecting outstanding violations. After this lawsuit started, TBTA generated a "Cost of Cashless Tolling" spreadsheet calculating the purported "Cost Per Violation Notice." In that spreadsheet, TBTA determined that the Cost Per Violation Notice was $61.95 for 2020, $41.20 for 2019, $28.61 for 2018, and $31.67 for 2017. *See, e.g.*, *Id.* at ¶ 88, ECF 226 (JA___). But for each year in its cost calculations, TBTA artificially inflated collection costs by including hundreds of millions of dollars in phantom charges for "Anticipated Costs of Collection paid to Outside Counsel." *Id.* at ¶ 89, ECF 226 (JA___).

TBTA listed "Anticipated Costs of Collection paid to Outside Counsel" as $564,347,034 for 2020 when in that year the actual cost to TBTA for that item was only $11,759. In other words, the spreadsheet that TBTA used to justify the fines artificially inflated TBTA's supposed costs of collection by more than $564,347,000. *Id.*, ECF 226 (JA___).

For 2019, TBTA included more than $400 million in purported costs for this item ($405,147,670) when TBTA in fact only paid $24,586. This means that TBTA's cost calculation for 2019 was artificially inflated by more than $405,147,000, calling into question TBTA's credibility and its purported justification for the amount and number of fines it imposed on Appellants and other drivers. *Id.*, ECF 226 (JA___).

For 2018, TBTA included more than $200 million in non-existent costs ($236,947,456) when it actually paid only $41,916 in collection costs to outside counsel for that year. For 2017, TBTA added tens of millions of dollars in costs ($84,949,006) even though TBTA only paid $58,550 in collection costs to counsel for that year. *Id.*, ECF 226 (JA___). Again, these artificially inflated calculations call into question, and create an issue of fact about, TBTA's justification for the fines and the number of the fines it imposed on Appellants. As discussed below, the District Court should not have resolved this issue and instead should have denied summary judgment so that the jury could assess whether the fines were excessive and whether TBTA was unjustly enriched.

TBTA's collection spreadsheet also includes costs that relate to the Tolls-By-Mail and cashless tolling generally rather than to toll violations specifically. For instance, TBTA included costs that would occur due to the cashless tolling program even without transactions escalating to violations, i.e., general costs that apply to the imaging and processing functions that would take place absent any violations to maintain cashless tolling infrastructure and process <u>all</u> toll transactions. *See, e.g.*, *Id.* at ¶¶ 91-92, ECF 226 (JA___).[7]

---

[7] Non-violation costs include Monthly Fee/Customer Service Fee–TBM, Image Review/OCR, Toll Bill Mailings, DMV Pass Through, DMV Staffing Support Costs, Walk-In-Service Centers, Credit Card Fees, Capital Cost Depreciation, BTO (Bridge & Tunnel Officers) Labor, B&T Operations, Tolling Operations, Tolling Technology, and Transcore Maintenance.

Contrary to TBTA's overbroad estimations, the direct costs attributable to cashless tolling violations include a much narrower subset of the costs included in TBTA' worksheet. *Id.* at ¶ 93, ECF 226 (JA___).[8] For each year in the cost collection worksheet, TBTA's <u>direct violation costs</u> are $14,853,469 (2020); $17,722,755 (2019); $16,887,953 (2018); and $6,413,532 (2017). *Id.* at ¶ 94, ECF 226 (JA___). For each year, total direct violation costs divided by total violation transactions yields a cost per violation transaction figure of **$1.52** (2020);[9] **$1.42** (2019);[10] **$1.37** (2018);[11] **$1.00** (2017).[12] *Id.* at ¶ 95, ECF 226 (JA___). As a result, TBTA's fines far exceed the cost of assessing and collecting each fine.

---

[8]    Direct violation costs include Acct Maintenance Fee - E-ZPass Viols; Violation Notice Mailings - E-ZPass; Violation Notice Mailings – TBM; Postage - Violations (Change from 2005); Violation Change Orders; TSI Commission–Violations; Violation Toll Write-Off; Contingency/Disbursements to Merani (TBTA's outside collection counsel).

[9]    $14,853,469/3,890,123 (E-ZPass violation transactions)+5,873,225 (Tolls-By-Mail Violation Transaction)

[10]    $17,722,755/4,442,126 (E-ZPass Violation Transactions)+7,991,767 (Tolls-By-Mail Violation Transactions).

[11]    $16,887,953/4,251,584 (E-ZPass Violation Transactions)+ 8,058,405 (Tolls-By-Mail Violation Transactions).

[12]    $6,413,532/1,638,987 (E-ZPass Violation Transactions)+4,792,187 (Tolls-By-Mail Violation Transactions),

### D.    TBTA Has a Waiver Matrix That It Does Not Affirmatively Disclose to Alleged Toll Violators

TBTA has a "Violation Fee Waiver Matrix" that it keeps secret from alleged toll violators, including Appellants. In general, the waiver matrix allows for the complete waiver of fees for first time toll violators and allows for an across-the-board reduction of fines to 20% for others so long as the underlying tolls are paid. *Id.* at ¶ 118, ECF 226 (JA____). TBTA always assesses the full amount of fines but may reduce fines if an alleged toll violator refuses to pay and disputes the charges. During the dispute process, TBTA does not affirmatively disclose the existence of the waiver matrix or the waiver matrix's guidelines concerning minimum fine payments. *Id.* at ¶ 119, ECF 226 (JA____).

### 5.    District Court Proceedings

In August 2019, the District Court denied TBTA's motion to dismiss the excessive fines claim, finding instead that the operative Complaint adequately alleged that TBTA's fines were punitive and grossly disproportionate to the underlying toll violation offense. *See Farina v. Metro. Transit Auth.*, 409 F. Supp. 3d 175, 198-99, 201-203 (S.D.N.Y. 2019). The District Court noted that a number of allegations supported denying the motion, including that: (1) the fines resulted from unwitting use of an inadequately funded or non-functioning E-Z Pass and the toll violations were not connected to fraud and did not threaten public safety; (2) the plaintiff had paid the full amount of thirteen fines; and (3) the fines had no

21

connection to the actual cost of collecting unpaid tolls and are often assessed multiple times against the same vehicle owner. *Id.* at 201-203. The Court also denied TBTA's motion to dismiss the unjust enrichment claim. *Id.* at 218-220. Following the denial of TBTA's motion to dismiss, Appellants filed an Amended Complaint, again bringing claims against TBTA for violating the Eighth Amendment's prohibition against excessive fines (through 42 U.S.C. § 1983) and for unjust enrichment.

In June 2021, TBTA moved for summary judgment on Appellants' claims. When deciding the motion, the District Court determined that Appellants had established an issue of fact concerning whether TBTA's fines were punitive. (SA 13-15). However, when determining whether TBTA's fines were grossly disproportional, the District Court contradicted key findings from its prior decision and ignored aspects of the evidentiary record that called TBTA's credibility into question. Although the District Court found that Appellants had produced evidence establishing that they unintentionally accumulated violations, the District Court emphasized the purported harm caused by Appellants' toll violations even though Appellants produced evidence that their violations did not threaten public safety or TBTA's toll operations and that TBTA produced phony accounting that improperly allocated costs to toll violations, including hundreds of millions of dollars never paid

to outside counsel. The District Court also granted TBTA's motion for summary judgment on Appellants' unjust enrichment claim. (SA 19-27, 29-31).

## STANDARD OF REVIEW

The Court reviews a district court's decision on a summary judgment motion *de novo. Knight First Amend. Inst. at Columbia Univ. v. United States Citizenship & Immigr. Servs*., No. 20-3827, 2022 WL 1193999, 32 F. 4th 124, 135 (2d Cir. 2022). In considering a motion for summary judgment, "the court must 'construe the facts in the light most favorable to the non-moving party' and 'resolve all ambiguities and draw all reasonable inferences against the movant.'" *Delaney v. Bank of Am. Corp*., 766 F.3d 163, 167 (2d Cir. 2014).

"It is the initial burden of the movant to come forward with evidence sufficient to entitle the movant to relief in its favor as a matter of law." *Vt. Teddy Bear Co. v. 1-800 Beargram Co*., 373 F.3d 241, 244 (2d Cir. 2004). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013).

In raising a triable issue of fact, the nonmovant carries only "'a limited burden of production,' but nevertheless 'must demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that

there is a genuine issue for trial.'" *Id.* (citing *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84 (2d Cir. 2004)). A district court should only grant summary judgment when "no reasonable trier of fact could find in favor of the nonmoving party." *Id.* (citing *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995)).

## SUMMARY OF ARGUMENT

This Court has held that determining whether a fine is excessive is a necessarily fact-intensive inquiry and that the "quantum, in particular, of pecuniary fines neither can, nor ought to be, ascertained by any invariable law." *Von Hofe v. U.S.*, 492 F.3d 175, 186 (2d Cir. 2007). Whether fines are grossly disproportional to an underlying offense requires a nuanced analysis of numerous factors, including the gravity of the underlying offense, the number of fines paid considering the maximum penalty or alternative penalties, and the nature of the harm caused by an offender's actions. *See United States v. Viloski*, 814 F.3d 104, 110 (2d Cir. 2016).

When opposing summary judgment, Appellants produced substantial evidence that they unwittingly accumulated their toll violations following TBTA's implementation of cashless tolling because of E-ZPass tag and notice issues. TBTA recognized the flaws of the cashless tolling system and that such issues could arise following the removal of toll booths, toll gates, and instant feedback indicators. Even so, TBTA assessed thousands of dollars in fines against Appellants, enlisted debt collectors, suspended Appellants' vehicle registrations, and ultimately demanded

that Appellants pay hundreds or thousands of dollars in fines in addition to the underlying tolls. Appellants also produced substantial evidence undercutting TBTA's inflated cost collection calculations and substantial evidence showing that the harm of Appellants' conduct was minimal when weighed against TBTA's aggressive collection efforts and steep fines. Accordingly, Appellants met their minimal burden of production to defeat TBTA's motion for summary judgment, especially considering the fact-intensive inquiry involved in determining whether a fine is grossly disproportional under the Eighth Amendment.

This Court should reverse the District Court's Opinion and Order and remand for further proceedings.

## **ARGUMENT**

## 1.  **The District Court Erred by Granted Summary Judgment for TBTA on Appellants' Eighth Amendment Claim**

The Eighth Amendment bars excessive fines, including "excessive civil fines." *Hudson v. United States*, 522 U.S. 93, 103 (1997); *see also Timbs v. Indiana*, 139 S. Ct. 682, 686-87 (2019) (holding that the Fourteenth Amendment incorporates the Eighth Amendment's prohibition against excessive fines and therefore applies to state action). "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998).

25

This Court has adopted a two-step inquiry to determine "whether a financial penalty is excessive under the Eighth Amendment." *Viloski*, 814 F.3d at 108 (citing *Bajakajian*, 524 U.S. at 321). First, a court must consider whether the payment or forfeiture at issue constitutes a "fine," meaning that it is punitive in nature and not "purely 'remedial.'" *Id.* at 109. Second, a court must weigh four non-exhaustive factors to determine whether the fine is "grossly disproportional" to the underlying offense. *Id.* at 110. "[D]etermining the excessiveness of a civil *in rem* forfeiture is necessarily fact-intensive and the 'quantum, in particular, of pecuniary fines neither can, nor ought to be, ascertained by invariable law.'" *Von Hofe v. U.S.*, 492 F.3d 175, 186 (2d Cir. 2007) (citing William Blackstone, 4 Commentaries 371).

Here, the District Court rightly concluded that TBTA's fines are punitive and fall within the purview of the Eighth Amendment's prohibition against excessive fines. (SA 13-15). However, the District Court improperly weighed the *Bajakajian* factors in favor of TBTA as a matter of law, ultimately granting summary judgment on Appellants' Eighth Amendment Claim. (SA 19-27, 29-31).

## A. The District Court Properly Concluded that TBTA's Fines Are Subject to Eighth Amendment Scrutiny

In its summary judgment decision, the District Court rightly determined that "a reasonable trier of fact on this record could conclude that toll violation fees were adopted for the punitive goal of deterrence." (SA 15). To determine whether the

Excessive Fines Clause applies, a court must decide if a fee "may be characterized, at least in part, as 'punitive'" or if the fee is "purely remedial," that is, intended not to punish the defendant but to compensate the Government for lost revenue. *Von Hofe*, 492 F.3d at 182. Even when a fee serves both remedial and punitive goals, it will not fall outside the Eighth Amendment's purview so long as it can be explained as serving in part to punish. *Austin v. United States*, 509 U.S. 602, 618 (1993).

Here, Appellants established that TBTA's fines are intended to deter rule-breaking and enforce compliance with TBTA's toll collection operations. The TBTA admitted that its toll violation fine regulation (21 NYCRR § 1021.3) is intended to deter toll evasion, including in the TBTA Board Action Items seeking approval to first impose the $50 toll violation fine and then to amend that regulation to increase toll violation fine to $100 for certain crossings. SDMF ¶¶ 72-75, ECF 203 (JA___). As also shown by the evidence, TBTA's fines are not remedial, i.e., revenue neutral. TTBA collected additional revenue from toll fines and regularly collected fines that pushed its revenue beyond 100% of total tolls due on its facilities during the time relevant to Appellants' toll violations (2017 to early 2019). *Id.* at ¶¶ 73, 78-79, 81, ECF 203 (JA___). Because TBTA's fines act as a deterrent, the fines are at least punitive in part and subject to the Eighth Amendment.

**B.** **The District Court Improperly Weighed the *Bajakajian* Factors to Find that TBTA's Fines Are Not Grossly Disproportional to Appellants' Underlying Toll Violations**

After determining that a reasonable factfinder could determine that TBTA's fines were punitive, the District Court usurped the role of weighing the fact intensive *Bajakajian* factors from the jury, undertaking its own factor analysis that ignored key aspects of the record and misplaced weight of other aspects the record.

This Court has held that there are several factors to consider when determining whether a fine is grossly disproportional, including: (1) the essence of the crime and its relation to other criminal activity, (2) whether the defendant fits into the class of persons for whom the statute was principally designed, (3) the maximum sentence and fine that could have been imposed, and (4) the nature of the harm caused by the defendant's conduct. *Viloski*, 814 F.3d at 110. This list is not exhaustive, and courts "may consider . . . whether the forfeiture would deprive the defendant of his livelihood, *i.e.,* his 'future ability to earn a living[.]'" *Id.* at 111. Ultimately, a "forfeiture is unconstitutionally excessive 'if it is grossly disproportional to the gravity of a defendant's offense.'" *Id.* at 110.

**i.** **When Weighing the First *Bajakian* Factor, The District Court Failed to Consider the Switch to Cashless Tolling's Role in Causing Appellants' Unintentional Violations**

In its Opinion, the Court found that Appellants had established that they unintentionally accumulated toll violations. (SA 20-21, 25, 29-30). However, the

Court ignored the impact of the cashless tolling transition and paid short shrift to that fact and to Appellants' lack of culpability when weighing whether a reasonable factfinder could determine that TBTA's fines were grossly disproportional to Appellants' underlying toll violations. *Id*.

The nature of the conduct at issue here—unwittingly failing to pay tolls—is unquestionably unconnected to any crime or fraud or willful conduct by Appellants and is minor compared to the severity of TBTA's penalty. *See Bajakajian*, 524 U.S. at 338-49 (finding forfeiture was grossly disproportional where willful failure to report currency to customs was unconnected to other crimes or fraud).

Before the District Court, TBTA produced no evidence that Appellants' conduct warranted harsh fines and TBTA cavalierly disclaimed any responsibility for Appellants' tolling issues even though TBTA recognized that issues would arise due to the cashless tolling transition and issues did, in fact, emerge as soon as TBTA tested cashless tolling on the Henry Hudson Bridge. Bressler Tr. at. 111:21-113:2, ECF 227-2 (JA___). Appellants, on the other hand, submitted ample evidence that they were vehicle owners and lessees who at worst made missteps while navigating a newly implemented cashless tolling system that was beset with issues, including the removal of instant feedback signals and delayed notice. SDMF ¶¶ 12-16, 31-33, ECF 203 (JA___).

Mr. Owens credibly asserted that the electronic components in his Tesla's windshield had interfered with his E-ZPass tag's signal, preventing his E-ZPass tag from being read by TBTA's toll equipment after TBTA switched to cashless tolling. *Id.* at ¶¶ 51-57, ECF 203 (JA___). Mr. Owens—who at that time was a twelve-year E-ZPass account holder with a spotless E-ZPass record—believed that his E-ZPass account was being charged and replenished as it had been as a matter of course since 2005. *Id.* at ¶¶ 51, 55, ECF 203 (JA___). The evidence is undisputed, however, that TBTA imposed $10,000 in fines and tow and impound fees on Mr. Owens.

Ms. Rojas also established unknowingly accumulated violation fines. Ms. Rojas only learned of the unpaid tolls and violations in April 2018 when TBTA began mailing toll bills and violation notices to her correct address. *Id.* at ¶ 44-46, ECF 203 (JA___). Although the District Court found that Ms. Rojas admitted she did not update her address with the DMV until 2018, Ms. Rojas, in fact, testified that she updated her address with the DMV in January 2016. *See* Rojas Tr. at 82: 19-83:21, ECF 188-3 (JA___). Thus, Ms. Rojas received fines even though she had provided a correct address for the toll bills and violations bills being accrued by her husband.

As for Ms. Reese, she too did not intentionally avoid tolls but was fined because her friend was using an invalid E-ZPass tag while he was driving her car. SDMF ¶¶ 62-64, ECF 203 (JA_____); Bressler Dec., Ex 33, ECF. 194-34 (JA___).

Ms. Reese's violations were inadvertent and occurred due the use of an invalid E-ZPass tag by another as well as incorrect address information being on file with the DMV rather than some design by Ms. Reese to evade TBTA's tolls.

Ultimately, the District Court's analysis of the first *Bajakajian* factor ignored that Appellants' inadvertent violations arose from a major shift in the toll collection process throughout New York City, a voluntary shift implemented by TBTA that came with inherent risks due to the elimination of toll gates, feedback indicators, and delayed notice. Appellants would not have accumulated violations for the reasons they did prior to cashless tolling, and the District Court should not have disregarded the major factor that the cashless tolling shift played in causing Appellants' violations. Based on the evidence produced by Appellants, a reasonable factfinder could find that TBTA's fines were grossly disproportional to the underlying toll violations based on the first *Bajakajian* factor alone.

> ii. **When Weighing the Third *Bajakajian* Factor, the District Court Erred by Determining That Appellants Were Not Assessed With, and Did Not Pay, Maximum Fines**

When deciding the motion to dismiss, the District Court—relying on TBTA regulations and a violation citation detail provided by TBTA and attached to the initial Complaint—found that the third *Bajakajian* factor weighed in favor of a finding of gross disproportionality because the plaintiff "paid thirteen fines of $100 each and one fine of $5." *Farina*, 409 F. Supp. 3d at 202. The District Court

concluded because that plaintiff "paid the maximum possible fine in thirteen instances [, that] weighs in favor of a plausible allegation that the fines were disproportionate to the offense." *Id.* But the District Court walked back this determination to grant summary judgment for TBTA even though Appellants submitted evidence that they too were assessed and paid maximum fines imposed by TBTA.

TBTA imposed 439 violations on Mr. Owens, assessing $43,550 in fines and imposing the maximum fine of $100 or $50 for each toll violation. In September 2019, Mr. Owens paid TBTA $8,170 in fines and $3,810 in tolls (a fine amount roughly two-and-a-half times greater than the underlying tolls and over five times to ten times greater than each individual toll associated with the maximum fine). Mr. Owens' violation citation details from TBTA state that he paid TBTA the full $100 or $50 administrative fee for 84 violations. SDMF ¶¶ 58-61, ECF 203 (JA___).

TBTA imposed forty-one violations on Ms. Rojas, assessing her $4,000 in fines. In September 2019, Ms. Rojas paid TBTA $720 for fines and $347.40 in unpaid tolls (a fine amount roughly two-and-a-half times greater than the total underlying tolls). *Id.* at ¶¶ 47-48, ECF 203 (JA___).

TBTA imposed ten violations on Ms. Reese, assessing her $1,000 in fines. In September 2019, Ms. Reese paid TBTA's debt collector $500 in administrative fees and $85 in tolls (a fine amount roughly five times greater than the total underlying

tolls and over five times to ten times greater than the individual tolls associated with the maximum fine). Ms. Reese's violation citation detail confirms that she paid TBTA the full $100 administrative fee for 5 violations. *Id.* at ¶¶ 65-66, ECF 203 (JA___).

When ruling on summary judgment, the District Court contradicted its earlier finding, this time ignoring the violation citation details provided by TBTA and instead determining that Appellants paid a reduced amount of the total fines assessed by TBTA. (SA 21). Contrary to the District Court's finding, Appellants' violation citation details demonstrate conclusively that they paid the full amount of fines for many of their toll crossings, and the District Court erred by determining that the third *Bajakajian* factor weighed in favor of summary judgment.

Moreover, the District Court erred by concluding that each Appellant did not pay maximum fines even though each Appellant approximately paid the maximum amount of fines allowed by TBTA's internal waiver matrix or more in Ms. Reese's case. (SA 21-22, 26, 30). Although TBTA regulations imposed a $50 or $100 fine depending on the toll crossing, TBTA's internal guidelines limited fines to 20% of the total fine amount where violations are in collections and there have been no prior dismissals, and limited fines to 20% of the total fine amount for toll violators who have had their vehicle registrations suspended for the first time. SDMF at 118-19, ECF 226 (JA ___); *see also* Bressler Dec., Ex. 4 at TBTA 000888-89.

33

Here, Ms. Rojas and Ms. Reese—who had no prior dismissals and whose accounts were in collections—paid 18% and 50% of their total fine amounts, respectively. *Id.* at ¶¶ 47-48, 65-66, ECF 203 (JA___). Mr. Owens—who never had his vehicle registration suspended prior to September 2019—paid 19% of his total fine amount. *Id.* at ¶ 60, ECF 203 (JA___). Even if each Appellant did not pay the total amount of fines imposed under TBTA regulation, each Appellant in fact paid the maximum amount of fines that were allowed by TBTA's internal settlement guidelines. Therefore, a reasonable factfinder could determine that Appellants paid the maximum amount of fines and that the third *Bajakajian* factor weighs in favor of a finding of gross disproportionality, militating against summary judgment.

      **iii.**    **When Considering the Fourth *Bajakajian* Factor, the District Court Erred by Crediting TBTA's Sham Calculations and By Ignoring Evidence Demonstrating That The Harms Caused By Appellants' Violations Did Not Warrant TBTA's Excessive Fines**

On TBTA's motion to dismiss, when analyzing the harm caused by toll violations under the fourth *Bajakajian* factor, the District Court considered TBTA's interests in maintaining tolling infrastructure versus the Complaint's allegations that TBTA's fines are excessive because "they bear no connection to the actual cost of collecting unpaid tolls and are assessed multiple times against the same vehicle owner." *Farina*, 409 F. Supp. 3d at 202. At that time, the District Court also noted

that there was no assertion that the fines were designed to address a public-safety concern or act as a safeguard against fraud. *Id*.

In its summary judgment motion, TBTA submitted inflated calculations and a self-serving declaration from its Acting Vice President of Tolling Operations to demonstrate that the harm caused by Appellants' toll violations warranted hundreds or thousands in fines. In opposition, Appellants demonstrated that TBTA concocted a post-litigation analysis that artificially inflated the cost of collecting outstanding toll violations. *Bressler* Dec., Ex. 3, ECF 227-11 (JA___). Besides improperly allocating costs related to Tolls-By-Mail and cashless tolling (such as imaging for Tolls-By-Mail and for matching license plates to E-ZPass accounts and maintaining the cashless tolling lane technology), TBTA artificially inflated its costs by hundreds of millions of dollars of non-existent costs to outside counsel that TBTA never paid, including $564 million for that cost item in 2020. SDMF ¶¶ 87-95, ECF 226 (JA___).

In granting summary judgment, the District Court improperly credited TBTA's astronomical calculations and improperly determined the factual issue of purported harm in TBTA's favor, stating that "the effort and expense to enforce [TBTA's] tolling procedures" was the type of harm that warranted summary judgment." (SA 23-24). In reaching that conclusion, the District Court could have only relied on TBTA's artificially inflated cost calculations, as TBTA's summary

judgment motion was devoid of any other evidence regarding the costs of collecting outstanding violations. Moreover, the District Court's determination regarding the cost of collections ignored Appellants' competing evidence that that the direct costs of collecting each outstanding toll violation were magnitudes lower than TBTA's outlandish calculations. SDMF ¶¶ 91-95, ECF 226 (JA___). The District Court made inferences that had no basis in the evidentiary record and against the evidence submitted by Appellants, warranting reversal by this Court.

Moreover, in weighing the purported harm to TBTA, the District Court also suggested that Appellants' toll violations undermined TBTA's ability to pay bondholders and the purposes of cashless tolling, including improving safety and reducing traffic and pollution. TBTA's primary source of proof of those harms was a declaration by its Acting Vice President of Tolling Operations (Ms. Bressler) stating in conclusory fashion that lost revenue impedes TBTA operations. The Court's determination and Ms. Bressler's declaration ignore that, as an initial consideration, Appellants remedied any purported harms to TBTA by repaying their tolls. Beyond that, Appellants offered evidence that toll violation fines were, in fact, a boon for the TBTA for the period relevant to Appellants' claims, from 2017 to the beginning of 2019. *Id.* at ¶¶ 76-81, ECF 203 (JA___). For example, 2018's budget summary reveals that TBTA earned higher than expected toll violation fine revenue

in 2018 and reduced other business expenses resulting from "lower than anticipated toll collection processing costs." *Id.* at ¶ 81, ECF 203 (JA___).

In opposition to TBTA's summary judgment motion, and in line with the District Court's initial decision on TBTA's motion to dismiss, Appellants produced evidence showing that TBTA's fines do not serve a safety purpose (as conceded by TBTA's FRCP 30(b)(6) deponent), are repeatedly assessed against the same unsuspecting vehicle owners and are multiples higher than the underlying tolls, and that the cost of collecting each violation pales in comparison to the amount of fines imposed and paid by Appellants. *Id.* at ¶¶ 69-71, 82-83, 87-95, ECF No. 226 (JA___). Given that showing, a reasonable factfinder could determine that the fines levied against Appellants were grossly disproportional to the underlying toll violations, especially when Appellants' violations resulted from problems with cashless tolling that had been acknowledged by TBTA. The District Court should not have determined the fourth *Bajakajian* factor against Appellants as a matter of law and should not have granted summary judgment for TBTA on the excessive fines claim.[13]

---

[13] The District Court misplaced reliance on *Tsinberg v. City of New York*, 2021 WL 1146942, No. 20 Civ. 749 (PAE) (S.D.N.Y. Mar. 25, 2021), a procedurally and substantively distinguishable case, to find against Appellants on the harm factor of the *Bajakajian* analysis. (SA 23-24). *Tsinberg* was decided on a motion to dismiss challenging the adequacy of the *Tsinberg* plaintiff's allegations. Here, on the other hand, TBTA had the burden on its summary judgment motion to show that it suffered harms with admissible evidence, a burden it attempted to meet through a spurious

**2.    The District Court Erred By Granting Summary Judgment for TBTA on Appellants' Unjust Enrichment Claim**

The District Court granted summary judgment for TBTA in error on Appellants' unjust enrichment claim, finding that Appellants did not "articulate[] how as a matter of law [TBTA's] retention of the fines would be against equity and good conscience." (SA 31). Contrary to the District Court's finding, Appellants demonstrated a genuine issue of material fact regarding whether TBTA equitably retained Appellants' fines.

A "cause of action for unjust enrichment arises when one party possesses money . . . that in equity and good conscience they should not have obtained or possessed because it rightfully belongs to another." *Newbro v. Freed*, No. 06-1722-CV, 2007 WL 642941, at *2 (2d Cir. Feb. 27, 2007) (summary order) (emphasis in original) (citation omitted). In its opinion on TBTA's motion to dismiss, the District Court stated that "If, as [plaintiff] asserts, she paid wrongfully-demanded fines under protest and under the threat of the loss of property interests, it is narrowly possible

---

analysis that artificially inflated collection costs by hundreds of millions of dollars. The District Court credited that analysis in error when granting summary judgment and despite Appellants' competing showing that TBTA did not suffer harms that warranted Appellant's harsh fines. Substantively, *Tsinberg* is distinguishable due to the culpable behavior of the plaintiff there, including his sustained refusal to pay the tickets (and accruing additional tickets) even as he was challenging them as excessive under the Eighth Amendment. In this case, however, Appellants accrued violations unintentionally, took steps to remedy their toll violation issues as soon as they discovered there was a problem, and they paid their underlying tolls remedying any harm that could result to TBTA due to uncollected revenue.

that the retention of her payments by the TBTA could be 'against equity and good conscience[.]'" *Farina*, 409 F. Supp. 3d at 220.

Here, each consideration that warranted denying TBTA's summary judgment motion on Appellants' Eighth Amendment claim also warranted denying summary judgment on Appellants' unjust enrichment claim. Appellants produced evidence showing they paid their underlying tolls plus hundreds or thousands of dollars in fines that were excessive given that Appellants accidentally accumulated violations due to intrinsic problems with cashless tolling. Thus, even if the amount of TBTA's fines do not rise to an unconstitutional level, there is still a genuine dispute of material fact regarding whether TBTA's retention of Appellants' fines is inequitable.

Moreover, as the District Court discussed in its motion to dismiss decision, Appellants submitted substantial evidence showing they involuntarily paid fines to TBTA, including that (1) Appellants paid the maximum administrative fees after TBTA enlisted a debt collector to collect Appellants' outstanding tolls and toll violations; (2) TBTA either threatened or actually suspended Appellants' vehicle registrations; and (3) TBTA did not disclose its waiver matrix and instead charged Appellants the maximum fees and demanded Appellants pay those fees, an utterly unfair process that manipulated certain violators into paying more than they should have under TBTA's internal policies, including Reese who paid 30% more than TBTA's waiver matrix required. SDMF ¶¶ 60, 118-19, ECF 226 (JA___). Contrary

to the District Court's summary judgment determination, Appellants' fines were <u>not</u> reasonable considering the minimal amount of Appellants' underlying tolls (which were repaid) and the minimal amount of harm caused by Appellants' violations. The District Court should have not granted summary judgment on Appellants' unjust enrichment claim.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should reverse the District Court's order granting summary judgment on Appellants' Eighth Amendment and unjust enrichment claims and remand the case to the District Court for further proceedings.

Dated:    September 23, 2022        Respectfully submitted,

By:/s/ Stephen J. Fearon, Jr.
      Stephen J. Fearon, Jr.

SQUITIERI & FEARON, LLP
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 421-6492
Facsimile: (212) 421-6553
stephen@sfclasslaw.com

*Attorney for Plaintiffs-Appellants*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure and Second Circuit Local Rule 32.1(a)(4)(A) because it contains 9,202 words, excluding the parts of the brief exempted by Rule 32(f).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated:       September 23, 2022       Respectfully submitted,

By:/s/ Stephen J. Fearon, Jr.
      Stephen J. Fearon, Jr.

SQUITIERI & FEARON, LLP
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 421-6492
Facsimile: (212) 421-6553
stephen@sfclasslaw.com

*Attorney for Plaintiffs-Appellants*

# SPECIAL APPENDIX

# TABLE OF CONTENTS

PAGE

Opinion and Order of the Honorable P. Kevin Castel,
  dated March 10, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  SPA-1

Judgment, dated March 11, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  SPA-35

Eight Amendment to the Constitution of the United States . . . . . . . . . . .  SPA-36

42 U.S.C.A. § 1983 - Civil Action for Deprivation of Rights  . . . . . . . . .  SPA-37

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
MIRIAN ROJAS, BRIAN OWENS and
KORISZAN REESE,

                        Plaintiffs,                        18-cv-1433 (PKC)

        -against-                                OPINION
                                                     AND ORDER

TRIBOROUGH BRIDGE AND TUNNEL
AUTHORITY and THE PORT AUTHORITY OF
NEW YORK AND NEW JERSEY,

                         Defendants.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

          Defendants Triborough Bridge and Tunnel Authority ("TBTA") and the Port

Authority of New York and New Jersey (the "Port Authority") are public authorities that oversee

bridge and tunnel crossings in and around New York City.  Those crossings sometimes become

traffic bottlenecks, and the defendants aspire to manage them efficiently while also collecting

vehicle tolls.  Toll collection presents an ongoing challenge, and in 2019, the TBTA alone

recorded more than twelve million tolling violations.

          Beginning in 2017, the two agencies began to implement a "cashless tolling"

process for the collection of tolls.  When a vehicle traverses a tolled crossing, a license plate

reader records a toll, and sends a toll bill by mail to the address on file with the license plate

holder's home-state Department of Motor Vehicles ("DMV").  Vehicle owners also have the

option of registering an E-ZPass account, in which case, an antenna communicates with a

transponder tag affixed to the registrant's vehicle and the amount of the toll is withdrawn from

the E-ZPass account.  Some crossings, such as the George Washington Bridge, have not yet fully

transitioned to tolls by mail, and continue to offer cash-only toll lanes.

Over periods of months or years, vehicles owned by the three plaintiffs in this

case made multiple toll crossings without paying the mandatory tolls.  Defendants sent multiple

toll bills and violation notices to plaintiffs' addresses on file with the Department of Motor

Vehicles ("DMV"), to no avail.  Plaintiffs' outstanding tolls accumulated, as did the violation

fees arising from their non-payment.  The TBTA initially demanded $43,650 in fines from

Richard Owens, $4,000 in fines from Mirian Rojas, and $1,000 from Koriszan Reese, while the

Port Authority demanded $1,200 from Rojas and $1,700 from Reese.  Ultimately, each plaintiff

paid significantly reduced fines, and, in some instances, were given discounts on the payments of

their outstanding tolls.

Plaintiffs assert that their fines were grossly disproportional to their underlying

violations, and, through 42 U.S.C. § 1983, assert that defendants violated the prohibition against

excessive fines contained in the Eighth Amendment to the U.S. Constitution.  Plaintiffs also

bring a claim of unjust enrichment against the TBTA.

Discovery in now closed, and defendants move for summary judgment in their

favor pursuant to Rule 56, Fed. R. Civ. P.  To the extent that defendants urge that plaintiffs do

not have Article III standing, their motions will be denied.  On the issue of whether the fees are

punitive and fall within Eighth Amendment scrutiny, plaintiffs have pointed to evidence that

would permit a reasonable trier of fact to conclude that the TBTA's fees are punitive in nature,

but they have failed to do so as to the Port Authority's fees, and the Port Authority's motion will

be granted.  Finally, the Court concludes that no reasonable trier of fact could conclude that any

of the fines paid by plaintiffs were grossly disproportional to the gravity of their underlying

**SPA-3**

violations, and defendants' summary judgment motions will be granted.  See United States v.

Bajakajian, 524 U.S. 321, 329 (1998).

Defendants' summary judgment motions will therefore be granted as to plaintiffs'

Eighth Amendment claims.  Summary judgment also will be granted to the TBTA as to

plaintiffs' unjust enrichment claim.  Accordingly, plaintiffs' claims will be dismissed and

judgment will be entered for the defendants.

BACKGROUND.

The Port Authority operates interstate tunnels and bridges between New York

City and the State of New Jersey, including the George Washington Bridge, the Holland Tunnel

and the Lincoln Tunnel.  (PA 56.1 ¶ 6; Pl. 56.1 Resp. ¶ 6.)  The TBTA operates major New York

City crossings that include the Queens Midtown Tunnel, the Robert F. Kennedy Bridge and the

Verrazano-Narrows Bridge.  See 21. N.Y.C.R.R. § 1021.3(b).  New York law provides that

every public authority that operates a bridge or tunnel facility is "authorized and empowered to

impose monetary liability on the owner of a vehicle" for failure to comply with toll-collection

regulations.  N.Y. Pub. Auth. § 2985(1).  In certain circumstances, refusing or evading payment

at a Port Authority crossing can be a misdemeanor, potentially subject to fines and

imprisonment.  (PA 56.1 ¶ 8; Pl. 56.1 Resp. ¶ 8.)

Defendants' tolled crossings accept payment through E-ZPass, an electronic toll-

collection system whereby a user registers an account and receives a designated transponder for

the vehicle.  (PA 56.1 ¶ 10; Pl. 56.1 Resp. ¶ 10.)  An antenna reads the transponder as the vehicle

enters the toll lane and charges the toll to the vehicle's funded E-ZPass account.  (PA 56.1 ¶ 10;

Pl. 56.1 Resp. ¶ 10.)  When a vehicle with an E-ZPass transponder passes through a cashless toll

lane, the system processes the toll through the vehicle's valid E-ZPass account associated with

- 3 -

the transponder.  (PA 56.1 ¶ 14; Pl. 56.1 Resp. ¶ 14.)  If the E-ZPass account has a negative

balance, a notice of violation is sent to the vehicle's registered owner, requesting payment of the

unpaid toll and a $50 administrative fee for each unpaid toll transaction.  (PA 56.1 ¶ 15; Pl. 56.1

Resp. ¶ 15.)

   In addition to allowing drivers to pay tolls by E-ZPass, defendants began to

implement a system for cashless toll collection in February 2017, known as "Tolls by Mail."

(PA 56.1 ¶ 13; Pl. 56.1 Resp. ¶ 13.)  If the vehicle does not have a valid E-ZPass transponder, the

vehicle's registered owner receives a toll bill for all new crossings, plus any late fees associated

with a previously unpaid bill.  (PA 56.1 ¶ 16; Pl. 56.1 Resp. ¶ 16.)  If toll bills remain unpaid, the

late fees become violations, and additional fees are assessed.  (PA 56.1 ¶ 16; Pl. 56.1 Resp. ¶ 16.)

   It is undisputed that the three plaintiffs in this case made numerous toll crossings

without making timely payment, eventually accumulating thousands of dollars in fines.

Plaintiffs Rojas and Reese paid fines to both the Port Authority and TBTA, while plaintiff

Owens paid fines only to the TBTA and was never fined by the Port Authority.

   Between 2016 and 2018, plaintiff Rojas's vehicle traveled over the George

Washington Bridge approximately thirty-two times.  (PA 56.1 ¶ 17; Pl. 56.1 Resp. ¶ 17.)  Her

vehicle did not have a valid E-ZPass transponder and the vehicle's driver did not pay tolls in

cash at the time of crossing.  (PA 56.1 ¶ 17; Pl. 56.1 Resp. ¶ 17.)  At the time Rojas's vehicle

crossed, the George Washington Bridge had not yet transitioned to fully cashless tolling, and

drivers without an E-ZPass had the option of paying tolls in a cash-only lane.  (PA 56.1 ¶ 11; Pl.

56.1 Resp. ¶ 11.)  The Port Authority mailed notices of violation to a home address for Rojas in

College Point, Queens, which was the address on file with the DMV.  (PA 56.1 ¶¶ 18-19; Pl.

56.1 Resp. ¶¶ 18-19.)  Certain of the notices did not arrive, and the parties dispute the exact

timeline of when Rojas's husband updated their mailing address from one in College Point, Queens to a new address in Maspeth, Queens.  (PA 56.1 ¶¶ 18-19; Pl. 56.1 Resp. ¶¶ 18-19.)  Rojas testified that she first began to receive Notices of Violation at her Maspeth address in 2018.  (Pl. 56.1 Resp. ¶ 22.)  Rojas's thirty-two violation totaled $480 in unpaid tolls and $1,600 in violation fees.  (PA 56.1 ¶ 20; Pl. 56.1 Resp. ¶ 20.)  On or about June 18, 2019, Rojas paid $360 in tolls and $1,200 in violation fees to clear her Port Authority violations.  (PA 56.1 ¶ 26; Pl. 56.1 Resp. ¶ 26.)

Rojas also incurred violations in connection with TBTA crossings.  The TBTA assessed Rojas $4,000 in violation fees in connection with forty-one toll violations, with the underlying tolls totaling $381.50.  (TBTA 56.1 ¶ 5; Pl. Resp. ¶ 5.)  The violations were assessed because Tolls-By-Mail bills were not paid, and, in one instance, an invalid E-ZPass tag was used with Rojas's vehicle.  (TBTA 56.1 ¶ 6; Pl. Resp. ¶ 6.)  In September 2019, the TBTA accepted a payment of $720 to resolve Rojas's outstanding violation fees.  (TBTA 56.1 ¶ 8; Pl. Resp. ¶ 8.)

Between 2017 and 2020, plaintiff Reese's vehicle crossed the George Washington Bridge approximately forty times without a valid E-ZPass transponder or paying a cash toll, resulting in $1,700 in violation fees and $606 in tolls.  (PA 56.1 ¶¶ 27, 29; Pl. 56.1 Resp. ¶¶ 27, 29.)  Notices of Violation were mailed to Reese's home address, first to an address on Light House Court in the Bronx and then an address on Mermaid Lane in the Bronx.  (PA 56.1 ¶ 28; Pl. 56.1 Resp. ¶ 28.)  Reese did not update her address with the Department of Motor Vehicles or E-ZPass when she moved from Light House Court to Mermaid Lane.  (PA 56.1 ¶ 31; Pl. Resp. ¶ 31.)  On or about September 16, 2019, Reese paid $311.25 in tolls and $1,000 in violation fees to clear her Port Authority violations.  (PA 56.1 ¶ 33; Pl. Resp. ¶ 33.)

**SPA-6**

The TBTA assessed Reese with $1,000 in violation fees in connection with 10 toll violations, with underlying tolls totaling $85.  (TBTA 56.1 ¶ 9; Pl. Resp. ¶ 9.)  Reese was assessed a violation because her vehicle had an invalid E-ZPass tag, which was associated with the account of a non-party individual who Reese has described as her best friend.  (TBTA 56.1 ¶ 10; Pl. Resp. ¶ 10.)  In September 2019, the TBTA accepted a payment of $500 to resolve Reese's outstanding violation fees.  (TBTA 56.1 ¶ 12; Pl. Resp. ¶ 12.)

Plaintiff Owens was assessed a total of $43,650 in fees arising out of 440 toll violations at TBTA crossings, all arising from his failure to make payment on Tolls-By-Mail bills.  (TBTA 56.1 ¶¶ 1-2; Pl. Resp. ¶¶ 1-2.)  It is undisputed that the TBTA sent notices of violation and Tolls by Mail to both Owens's home address and a UPS mailbox registered to him. (Bressler Dec. Exs. 16-18.)  Excluding one January 2020 violation, which post-dates Owens's payment of TBTA fines, his violation fees totaled $43,550 and the underlying tolls totaled $3,810.  (TBTA 56.1 ¶ 1; Pl. Resp. ¶ 1.)  In September 2019, the TBTA accepted a payment of $8,170 from Owens to resolve the 439 outstanding violation fees.  (TBTA 56.1 ¶ 4; Pl. Resp. ¶ 4.)

Defendants raise three principal arguments in moving for summary judgment. First, they assert that defendants do not have Article III standing because their injuries were self-inflicted and therefore are not "fairly traceable" to the Port Authority or the TBTA.  Second, they assert that the violation fees were not punitive in nature, and therefore are not "fines" subject to Eighth Amendment scrutiny.  Third, they assert that the fines are not excessive as a matter of law because they are not grossly disproportional to the gravity of plaintiffs' underlying violations.

- 6 -

**SPA-7**

SUMMARY JUDGMENT STANDARD.

   Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P.  A fact is material if it "might affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 248).  On a motion for summary judgment, the court must "construe the facts in the light most favorable to the non-moving party" and "resolve all ambiguities and draw all reasonable inferences against the movant." Delaney v. Bank of Am. Corp., 766 F.3d 163, 167 (2d Cir. 2014) (quotation marks omitted).

   It is the initial burden of the movant to come forward with evidence sufficient to entitle the movant to relief in its favor as a matter of law.  Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." Simsbury-Avon Pres. Soc'y LLC v. Metacon Gun Club, Inc., 575 F.3d 199, 204 (2d Cir. 2009).  In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)).  A court "may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party.'" Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (citation omitted).

SPA-8

DISCUSSION

I.      Defendants Have Not Come Forward with Evidence Demonstrating that
        Plaintiffs Lack Article III Standing.

The Port Authority and the TBTA urge that summary judgment should be granted

in their favor because no reasonable trier of fact could conclude that any plaintiff's injury is

fairly traceable to the actions of the Port Authority or the TBTA.  According to defendants, any

purportedly excessive fines are attributable to plaintiffs' failure to monitor their accounts or

mailings, or to keep current contact information on file with transportation agencies.  Thus,

defendants urge, plaintiffs' actions ruptured any "causal chain" between the defendants and their

claimed injuries, and deprives plaintiffs of Article III standing.

For a dispute to be properly resolved through the federal judicial process, a

plaintiff must have constitutional standing under Article III of the Constitution.  See Lujan v.

Defense of Wildlife, 504 U.S. 555, 560 (1992).  To demonstrate Article III standing, "[t]he

plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged

conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."

Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016).  "The party invoking federal jurisdiction bears

the burden of establishing these elements."  Lujan, 504 U.S. at 561.  "Since they are not mere

pleading requirements but rather an indispensable part of the plaintiff's case, each element must

be supported in the same way as any other matter on which the plaintiff bears the burden of

proof, i.e., with the manner and degree of evidence required at the successive stages of the

litigation."  Id.

Defendants urge that any injury suffered by plaintiffs was self-inflicted and

therefore does not satisfy the "fairly traceable" requirement.  "The traceability requirement for

Article III standing means that the plaintiff must 'demonstrate a causal nexus between the

**SPA-9**

defendant's conduct and the injury.'" Rothstein v. UBS AG, 708 F.3d 82, 91 (2d Cir. 2013)

(quoting Heldman v. Sobol, 962 F.2d 148, 156 (2d Cir. 1992)).  In assessing traceability,

"[courts] are concerned with something less than the concept of proximate cause," and a harm

that flows indirectly from a defendant's action is sufficient to satisfy the "fairly traceable"

requirement.  Id. at 92 (quotation marks omitted; emphasis in original).

       "To be sure, a plaintiff may not establish injury for standing purposes based on a

'self-inflicted' injury.  An injury is self-inflicted so as to defeat the causation necessary to

establish standing, however, 'only if . . . the injury is so completely due to the plaintiff's own

fault as to break the causal chain.'"  Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.,

710 F.3d 71, 85 (2d Cir. 2013) (quoting St. Pierre v. Dyer, 208 F.3d 394, 403 (2d Cir. 2000)).

For example, a plaintiff's injury was held not fairly traceable to the acts of the defendant where

the plaintiff was eligible to be fully reimbursed for a fee but failed to seek reimbursement.

Bandler v. Town of Woodstock, 832 Fed. App'x 733, 734-35 (2d Cir. 2020) (summary order).

Generally, however, "'[s]o long as the defendants have engaged in conduct that may have

contributed to causing the injury, it would be better to recognize standing.'"  NRDC, 710 F.3d at

85 (quoting St. Pierre, 208 F.3d at 402).

       In urging that plaintiffs' injuries were self-inflicted, the defendants point to

evidence that, they argue, reflects plaintiffs' inattention to tolling bills, mailings and credit card

statements.  Concerning Owens, defendants note that he testified at his deposition that he

permitted his young, school-aged children to check the mail and that he did not monitor his E-

ZPass account or credit card statements to confirm that he was being charged for toll crossings.

(Owens Tr. 43, 45, 110.)  In apparent sarcasm, Owens also stated in his deposition that the

family dog may have eaten his mail or that his children "could have walked off with it."  (Owens

**SPA-10**

Tr. 222.)  As to Rojas, defendants assert that her vehicle was not added to an E-ZPass account during the relevant period, and that bills and notices were mailed to her previous, out-of-date address, which she had failed to update with the Department of Motor Vehicles.  As to Reese, defendants note that she acknowledged in her deposition that her vehicle crossed with an invalid E-ZPass tag belonging to a friend and that she failed to update her address with the DMV: "Every time I move, I never update it.  So I wasn't aware that that was something that people do."  (Reese Tr. 47.)

Evidence going toward plaintiffs' lax approach to their mailings, billing statements and contact information does not, as a matter of law, "break the causal chain" of plaintiffs' claims.  The prohibition against excessive fines "'limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense.'"  von Hofe v. United States, 492 F.3d 175, 178 (2d Cir. 2007) (quoting Austin v. United States, 509 U.S. 602, 609-10 (1993)).  Plaintiffs' claims are directed to the proportionality of punitive fines in relation to the underlying violations.  The adequacy of notice and the due process afforded plaintiffs is not at issue.[1]  It is undisputed TBTA and Port Authority were responsible for administering the crossing, collecting tolls, and setting violation fees, and that plaintiffs paid violation fees.  For the purposes of an Article III standing analysis, plaintiffs' purported injuries are therefore "fairly traceable" to defendants.  See NRDC, 710 F.3d at 85.

Defendants' motion for summary judgment as to plaintiffs' Article III standing will therefore be denied.

---

[1] The Court previously dismissed certain plaintiffs' claims that notice did not satisfy the Constitution's guarantee of due process.  Farina v. Metro. Transportation Auth., 409 F. Supp. 3d 173, 206-12 (S.D.N.Y. 2019).

II.     Defendants' Summary Judgment Motions on the Issue of Whether their Fees Are Punitive in Nature Will Be Denied as to the TBTA but Granted <u>as to the Port Authority.</u>

A.  <u>Legal Standard.</u>

In order for a fine to be subject to Eighth Amendment scrutiny, it must be punitive in nature.  <u>United States v. Viloski</u>, 814 F.3d 104, 109 (2d Cir. 2016).  Defendants urge that they impose violation fees for solely remedial purposes and that those fees therefore should not be subject to Eighth Amendment scrutiny.  As will be explained, the TBTA's own summary judgment submissions suggest that the fees are intended to have a punitive effect.  As to the Port Authority, plaintiffs have pointed to no evidence indicating that its violation fees have a punitive purpose or effect.  The TBTA's summary judgment motion will therefore be denied and the Port Authority's will be granted.

The Eighth Amendment states, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  The protections of the Excessive Fines Clause are incorporated under the Fourteenth Amendment and applicable to the states.  <u>Timbs v. Indiana</u>, 139 S. Ct. 682, 686-87 (2019).

Courts apply a two-step inquiry to determine whether a financial penalty is excessive under the Eighth Amendment.  <u>Viloski</u>, 814 F.3d at 108-09.  First, courts consider whether the fine is punitive in nature and therefore falls within the Eighth Amendment's purview.  <u>Id.</u> at 109.  The Excessive Fines Clause applies where a fine "may be characterized, at least in part, as 'punitive,'" meaning that one of the goals is "to punish" the individual.  <u>Id.</u>  This protection applies to both criminal and civil proceedings.  <u>United States v. Sabhnani</u>, 599 F.3d 215, 263 n. 19 (2d Cir. 2010).  If the fine is punitive, the Court proceeds to consider whether the fine is unconstitutionally excessive.  <u>Viloski</u>, 814 F.3d at 109.

**SPA-12**

In evaluating the purpose of a fine, deterrence "has traditionally been viewed as a goal of punishment," in contrast to payments that "serve the remedial purpose of compensating the Government for a loss." Bajakajian, 524 U.S. at 329.  "[A] civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term." Austin, 509 U.S. at 610 (quotation marks omitted); see also Timbs, 139 S. Ct. at 689 (fines may serve "the penal goals of retribution and deterrence . . . .") (quotation marks omitted); Viloski, 814 F.3d at 109 (distinguishing "punitive" fines from "purely 'remedial' forfeitures . . . ."); von Hofe, 492 F.3d at 182 (a penalty falls within the Excessive Fines clause if its goal is to "deter and punish" the payer); cf. United States v. An Antique Platter of Gold, 184 F.3d 131, 139 (2d Cir. 1999) (a forfeiture is punitive if it is "imposed at the culmination of a criminal proceeding that required a conviction of the underlying felony and could not have been imposed upon an innocent party").

If the fine is "remedial," and is intended only to compensate the government for lost revenue, it "fall[s] outside the scope of the Excessive Fines Clause."  Id.  Similarly, a fine that is "coercive," such as a fine for civil contempt, has been held not to be a penalty when it attempts to secure compliance with a court order.  United States v. Mongelli, 2 F.3d 29, 30 (2d Cir. 1993) (per curiam).[2]

---

[2] The civil contempt penalty at issue in Mongelli was directed toward the contemptors' ongoing refusal to testify before a grand jury, and was intended to secure compliance with an existing order.  2 F.3d at 30.  The purpose of deterrence, by contrast, is to discourage future acts of wrongdoing.  See, e.g., Hudson v. United States, 522 U.S. 93, 105 (1997).

B.  The TBTA's Summary Judgment Motion Directed to the Purportedly
Non-Punitive Nature of the Violation Fees Will Be Denied.

The TBTA asserts that the summary judgment record demonstrates that its

violation fees are intended to make the TBTA whole for lost tolls and associated costs, and are

not punitive in nature.  Because a reasonable trier of fact could conclude that the fees are

punitive, the TBTA's motion will be denied.

To support its argument that violation fees are non-punitive, the TBTA points to

its statutory authority for such fees.  The statute authorizes public authorities to "impose

monetary liability" on vehicle owners who fail to comply with toll-collection regulations, and

provides that "[t]he owner of a vehicle shall be liable for a civil penalty" if the vehicle was used

with permission and violated toll-collection regulation.  N.Y. Pub. Auth. § 2985(1), (2).  The

statute also sets graduated caps on the amounts that may be charged as "a monetary penalty,"

depending on the number of violations the individual has incurred.  Id. § 2985(5).  The TBTA's

implementing regulations provide that the owner of any vehicle that traverses a TBTA-

administered bridge or tunnel without paying a toll "shall be liable to the [TBTA] for an

administrative fee, known as the toll violation fee."  21 N.Y.C.R.R. § 1021.3(b).

The TBTA notes that its implementing regulations permit violators to contest the

assessment of tolls and fees, and that each of the three plaintiffs ultimately paid fees that were

substantially reduced from the amounts originally demanded.  Id. § 1021.3(d).  Without pointing

to evidence in the record, the TBTA urges its toll violation fees were adopted to secure

compliance and not function as a penalty.  (TBTA Mem. at 11, citing Bd. of Health Pub. Review

Comm'n v. NYC Bd. of Health, No. 100847/2013 (N.Y. Sup. Ct. N.Y. Cnty. Sept. 4, 2014).)

The statute and regulation cited by the TBTA does not demonstrate that toll

violation fees have a purely remedial purpose or effect.  The TBTA's implementing regulations

do not speak to the fees' purpose, and the New York statute expressly refers to the fees as a "civil penalty" and "monetary penalty." The fact that a second violation within eighteen months is met with a "monetary penalty" not to exceed $100 or five times the evaded toll, whichever is greater, and a third violation a "penalty" not exceeding $150 or ten times the evaded toll, suggests a deterrent rather than remedial intent. N.Y. Pub. Auth. § 2985(5). The TBTA has not explained how a violator's ability to contest a fee goes toward a remedial function and judicial decisions cited by the TBTA involved agencies and fee regimes with no apparent relationship to the defendants in this case.

The TBTA also points to certain documents from the Metropolitan Transit Administration ("MTA") and the TBTA that, it urges, demonstrate that the fees were intended to be revenue-neutral and to make up for the losses resulting from unpaid tolls. But the evidence submitted by the TBTA contains contradictory statements about the purposes for adopting the fees. An October 2016 document prepared for an MTA board meeting discussed "toll violation enforcement regulations" and the suspension of vehicle registrations "for habitual or persistent violators." (Bressler Dec. Ex. 43 at 1752-53.) It stated that increasing the violation fee to $100 "will increase toll revenue . . . by deterring toll evasion." (Bressler Dec. Ex. 43 at 1753.) A recital provision in a draft resolution of the MTA Board stated that increasing the violation fee to $100 at certain crossings "is expected to increase toll revenue by deterring toll evasion at the Authority's cashless Open Road Tolling facilities." (Bressler Dec. Ex. 43 at 1754.) Plaintiffs also point to the deposition testimony of the TBTA's Rule 30(b)(6) witness, Anne Marie Bressler, who testified that the TBTA's violation fee was intended "to disincentivize the customer from violating in this case to keep an [E-ZPass] account funded." (Morales Dec. Ex. 21 at 273.) This is evidence that the fees were adopted in part with a goal of deterring violations

– a punitive goal that places the fees under the scrutiny of the Excessive Fines Clause.  <u>See</u>, <u>e.g.</u>, <u>Bajakajian</u>, 524 U.S. at 329.  Some evidence cited by the TBTA does include agency documents indicating that any violation fee "is intended to be revenue-neutral" and "to offset the financial burdens arising from toll violations . . . ."  (Bressler Dec. Ex. 39 at 9112-13; Ex. 41 at 1162; <u>see also</u> Ex. 48 at 4058 (summarizing discussion about revenue from violation fees offsetting losses from toll evasion); Ex. 46 at 1969.)

A reasonable trier of fact on this record could conclude that toll violation fees were adopted for the punitive goal of deterrence.  The TBTA's motion directed toward the purportedly non-punitive nature of the fees will be denied.

C.  The Port Authority's Summary Judgment Motion Directed to the Purportedly <u>Non-Punitive Nature of Its Fees Will Be Granted.</u>

In asserting that its tolling violation fee was intended to be remedial and revenue neutral, the Port Authority principally relies on a declaration submitted by its Rule 30(b)(6) witness, Charles Fausti, who has the job title of Program Director for Toll Systems & Revenue Management at the Port Authority.  (Docket # 207-4.)  Fausti states that the $50 fee assessed for each unpaid toll is a lower amount than the $58.08 in costs to the Port Authority.  (Fausti Dec. ¶ 14.)  He separates the costs into twelve categories:

- $14.61 (violation notices, license plate image review and associated Department of Motor Vehicle "DMV" costs);
- $2.49 (E-ZPass Customer Service Center change orders for violations);
- $16.33 (E-ZPass Customer Service Center base contract invoices related to violations);
- $3.41 (collections agency fees);
- $1.94 (outside law firm collection costs);
- $0.78 (lane maintenance costs to calculate violations rates);
- $2.28 (Port Authority staff DMV suspension program labor costs);
- $0.04 (Port Authority customer service staff);
- $0.12 (Port Authority finance staff);

# SPA-16

- $0.08 (Port Authority audit and revenue accounting);
- $15.24 (Port Authority toll write-offs);
- $0.76 (Port Authority DMV support costs);
- **TOTAL: $58.08 per each unpaid toll transaction**

(Fausti Dec. ¶ 14.)  In his deposition, Fausti stated that he met with his own staff and with consultants and reviewed invoices to determine the Port Authority's costs per tolling violation. (Fausti Dep. 84-85.)

In opposition, plaintiffs point to certain infirmities in Fausti's calculation and methods.  Fausti testified at his deposition that he was not involved in a 2009 decision that increased the violations fee from $25 to $50 and was not personally aware of any internal Port Authority analysis about the fee increase.  (PA 56.1 Resp. ¶ 97; Fausti Dep. at 86-87.)  The Port Authority does not dispute plaintiffs' assertion that prior to Fausti's analysis, the Port Authority had not determined the costs of collecting an outstanding toll violation.  (Pl. 56.1 ¶ 108; PA 56.1 Resp. ¶ 108.)  Plaintiffs urge that Fausti's $58.08 figure is "substantially inflated" by costs that are not related to processing and collecting violations, including a $5.383 million expense that the Port Authority took approximately six years ago for toll violation write-offs.  (Pl. 56.1 ¶¶ 109-10.)

But plaintiffs do not point to evidence that would permit a reasonable trier of fact to conclude that the Port Authority's violation fees have a deterrent purpose or effect, or that the fees play any other punitive role.  By way of contrast, in their opposition to the TBTA's motion, plaintiffs identified statements from the MTA and TBTA that described a deterrent purpose for violation fees.  For the Port Authority's fees, assuming that Fausti's method of calculation was imprecise, such a defect is not evidence that would permit a reasonable finder of fact to conclude

- 16 -

that the Port Authority's $50 violation fee has a deterrent purpose, even in part.[3]  As the non-movants, plaintiffs have failed to meet their "limited burden of production" to come forward with "specific facts showing that there is a genuine issue for trial."  Powell, 364 F.3d at 84 (quotation marks omitted).

Because plaintiffs have not directed the Court to evidence that would permit a reasonable trier of fact to conclude that the Port Authority's violation fees are punitive in nature, they have not pointed to evidence that the fees fall within the Eighth Amendment's scrutiny. The Port Authority's summary judgment motion will be granted.[4]

### D.  Defendants' Argument about Plaintiffs' Ability to Mitigate their Fees Is Misplaced.

Similar to their Article III standing argument, both defendants urge that their violation fees fall outside of Eighth Amendment scrutiny because plaintiffs had an opportunity to mitigate their fees.  The TBTA and Port Authority point to the previously-discussed evidence that plaintiffs did not diligently check their mailings, update their addresses with state vehicle agencies, or use valid E-ZPass tags.  The Port Authority also notes that plaintiffs could have avoided the violations if they used the cash lane at the George Washington Bridge.

Defendants do not explain how the possibility of mitigating a fine speaks to whether that fine is subject to Eight Amendment scrutiny.  As the First Department persuasively observed: "Under that rationale, no penalty could ever be subject to the Excessive Fines Clause because any potential violator could always avoid a fine by not committing the charged conduct

---

[3] The Port Authority's power to issue violation fees does not appear to arise from section 2985 of the New York Public Authorities Laws, which described violation fees as a "penalty" and allowed for escalating caps.  The Port Authority appears to have separate statutory authorization to collect tolls and enforce toll obligations, and the refusal or evasion of toll payments is classified as a misdemeanor.  N.Y. Unconsolidated Laws §§ 6501, 6512, 6802, 6809, 6816.  The parties have not pointed to a particular provision that speaks to the Port Authority's assessment of civil tolling violation fees.

[4] For the reasons that will be discussed, the Court separately concludes that even if the Port Authority's fees have a punitive character, they would not be grossly disproportional to the underlying violations.

in the first place." Prince v. City of New York, 108 A.D.3d 114, 121 n.4 (1st Dep't 2013).

Plaintiffs' purported inattention to mailings, updating their addresses or monitoring their E-ZPass

status does not go toward whether the fees were punitive in nature and therefore subject to

Eighth Amendment scrutiny.

To the extent that the defendants move for summary judgment based on plaintiffs'

ability to mitigate their fees, the motion will be denied.

III.   The Court Concludes as a Matter of Law that the Fines Paid by Plaintiffs
Were Not Grossly Disproportional to the Gravity of their Violations, and
That They Therefore Did Not Violate the Excessive Fines Clause.

A. Legal Standard.

If a fine is punitive in nature, a court then considers whether it is

unconstitutionally excessive. Viloski, 814 F.3d at 109. "The touchstone of the constitutional

inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the

forfeiture must bear some relationship to the gravity of the offense that it is designed to punish."

Bajakajian, 524 U.S. at 334.

A fine "violates the Excessive Fines Clause if it is grossly disproportional to the

gravity of a defendant's offense." Id. "[J]udgments about the appropriate punishment for an

offense belong in the first instance to the legislature," and "any judicial determination regarding

the gravity of a particular criminal offense will be inherently imprecise." Id. at 336. A court

"must compare the amount of the forfeiture to the gravity of the defendant's offense. If the

amount of the forfeiture is grossly disproportional to the gravity of the defendant's offense, it is

unconstitutional." Id. at 336-37.

Applying Bajakajian, the Second Circuit has adopted a four-factor test that guides

the proportionality analysis. Viloski, 814 F.3d at 110. Courts should weigh:

**SPA-19**

> (1) the essence of the crime of the defendant and its relation to other criminal activity, (2) whether the defendant fits into the class of persons for whom the statute was principally designed, (3) the maximum sentence and fine that could have been imposed, and (4) the nature of the harm caused by the defendant's conduct.

Id. (quoting United States v. George, 779 F.3d 113, 122 (2d Cir. 2015)).  These factors are not exhaustive and should not be treated as a "rigid test" of a fine's proportionality.  Id. at 110-11.  For example, courts should not consider a penalized party's personal characteristics – such as age, health or present finances – but they may consider whether the fine would deprive the party of his or her livelihood.  Id. at 115-16.

        B.    **The TBTA's Summary Judgment Motion Will Be Granted as to Owens's Eight Amendment Claim**

           1.    **The TBTA's Fines of $18.61 per Violation Were Not Grossly Disproportional to the Underlying Violations.**

Owens was initially assessed $43,550 in violation fees in connection with 439 toll violations between February 2017 and June 2019, primarily incurred when he crossed the Queens Midtown Tunnel.[5]  (TBTA 56.1 ¶ 1; Pl. 56.1 Resp. ¶ 1; Pl. 56.1 ¶ 53; TBTA 56.1 Resp. ¶ 53.)  His unpaid tolls totaled $3,810.  (Id.)  In September 2019, Owens paid $8,170 to resolve all outstanding violation fees.  (TBTA 56.1 ¶ 4; Pl. 56.1 Resp. ¶ 4.)  Accordingly, Owens paid a total of $8,170 in fines, in connection with $3,810 in unpaid tolls.  Each fine averaged approximately $18.61, and the average amount of each unpaid toll was approximately $8.68.  The fines paid by Owens reflects a multiplier of approximately 2.14 against each unpaid toll.

---

[5] After his payment of his then-outstanding fines, Owens incurred one additional fee in connection with a January 2020 crossing, but the current status of that fee, which was incurred after the commencement of this litigation, is not explained and is not at issue in the case.  (TBTA 56.1 ¶ 1; Pl. 56.1 Resp. ¶ 1; TBTA 56.1 Resp. ¶ 58.)

The Court applies the four factors set out by the Second Circuit to Owens's fines and ultimately concludes that no reasonable fact finder could conclude that Owens's fines were grossly disproportional to the gravity of his underlying violations.

Factor 1: The essence of the violation and its relationship to other prohibited activity. Over approximately 28 months, Owens accumulated 439 violations for unpaid tolls.[6] Owens was a longtime E-ZPass account holder, and testified in his deposition that TBTA antennas did not read his E-ZPass signal after he acquired a new Tesla, the technologies of which, he asserts, interfered with the E-ZPass signal. (Pl. 56.1 ¶ 54.) Over the 28-month period, Owens was billed for the crossings through Tolls by Mail, and notices of violation were also mailed to him. (Bressler Dec. Exs. 9, 10, 16-18.)

The underlying violation is fairly straightforward. Owens traversed TBTA-managed toll crossings, particularly the Queens Midtown Tunnel, and failed to pay the tolls later demanded in mailings. Drawing every reasonable inference in favor of Owens as the non-movant, the Court accepts his explanation that he was unaware that TBTA facilities were not reading his E-ZPass, and that, as a busy restauranteur, he was not closely monitoring his E-ZPass account or the mailings addressed to him. (Pl. 56.1 ¶¶ 51, 53-54, 57.) There is no suggestion that Owens intended to evade toll payments or defraud the TBTA. The summary judgment record reflects that the essence of Owens's violation was a failure to pay tolls caused by mere inattention to toll procedures, official mailings and the status of his E-ZPass account.

Factor 2: Whether Owens fits into the class of persons for whom the violation fees were principally designed. There is no dispute that as the owner of a vehicle that traversed a

---

[6] Apparently in error, plaintiffs occasionally state that Owens accrued 493 violations. (Opp. Mem. at 19; Pl. 56.1 ¶ 58.) It appears that plaintiffs transposed the 3 and the 9, as they do not otherwise dispute that 439 violations are at issue. (TBTA 56.1 ¶ 1; Pl. 56.1 Resp. ¶ 1.)

- 20 -

crossing without paying the required tolls, Owens falls into the class of persons for whom the violation fees were designed.

Factor 3: The maximum fine that could have been imposed.  TBTA regulation imposes a fine of $100 upon the owner of any vehicle that "violates toll collection regulations" when crossing the Queens Midtown Tunnel.  21 N.Y.C.R.R. § 1021.3(b).  Here, Owens paid a fine of $18.61 for each violation.

In opposition, plaintiffs assert that Owens and the other plaintiffs did, in fact, pay the maximum fine that could be imposed by the TBTA.  A "Violations Fee Waiver Matrix" (the "Fee Matrix") used by the TBTA gives internal guidance on the reduction of violations fees based on factors that include the vehicle owner's prior requests for fee dismissals, history of registration suspension by the DMV, whether tolls have been paid in full, whether the vehicle has an E-ZPass account, and whether a collections agency has become involved in the toll collection.  (Bressler Dec. ¶ 11; Docket # 186-6.)  For example, under the Fee Matrix, if a collections agency is seeking to collect unpaid tolls and no prior violations have been dismissed, the TBTA will "[a]ssess 20% on fees provided tolls are paid . . . ."  (Docket # 186-6.)  If it is the violator's second request for dismissal, the TBTA will assess 30% on the fees.  (Id.)

Plaintiffs characterize the Fee Matrix as "a secretive negotiation process" that was "utterly unfair" to violators.  (Opp. Mem. at 25.)  But the Fee Matrix appears to set broad internal guidance for the resolution of disputed fees.  There is no assertion that the Fee Matrix was binding within the TBTA, and, indeed, plaintiffs' payments varied from the document's guidance: Owens's payment of $8,170 was approximately 18.76% of the $43,550 initially demanded.  The TBTA exercised its discretion to fine Owens in an amount well below the

**SPA-22**

maximum $100-per-violation fee set out in its regulations, and there is no evidence to indicate that the Fee Matrix served some nefarious or coercive purpose.

   Owens also urges that he paid the maximum fine that could have been imposed because, in calculating the total fines to be paid, the TBTA allocated the full $100 fine to certain violations while dismissing other fines in their entirety, as opposed to reducing each proportionally. (Bressler Dec. ¶ 21; Docket # 186-7.) The TBTA's calculations are reflected in a document that the TBTA describes as "a worksheet that was used to resolve Mr. Owens's violation fees." (Bressler Dec. ¶ 21.) The undated worksheet states that Owens had one registration suspension. (Docket # 186-7 at 9440.) A chart includes calculations for Owens's total fines if reduced to either 30% or 20% of the initial demands. (Id.) The pages that follow consist of a lengthy spreadsheet with columns headed "Amount Due," "Amount Paid" and "Amount Dismissed." (Id. at 9441-56.) The worksheet reflects that, as to certain fines, Owens paid full amounts of $50 and $100. (Id. at 9441, 9443, 9447-48, 9454, 9455.) For one fine, he paid $20 out of $100, and $80 of the fine was dismissed. (Id. at 9448.) For another, he paid $50 out of $100, and $50 of the fine was dismissed. (Id. at 9454.) For the significant majority of Owens's fines, however, the full $100 fine was dismissed, without any payment by Owens. (Id. at 9441-56.)

   The worksheet reflects that the TBTA calculated an across-the-board reduction of Owens's total fines, and accounted for the reduction by charging full fines of $50 and $100 to certain violations and dismissing other violations in their entirety. The TBTA effected a proportional reduction of Owens's fines in their entirety, no different than if it had attributed a

payment of $18.61 to each fine and dismissed the remainder.  The worksheet is evidence that the

TBTA reduced Owens's fines to an amount well below the $100 maximum.[7]

        <u>Factor 4: The nature of harm caused by Owens's conduct.</u>  The TBTA emphasizes

that it relies on toll revenue to pay its expenses and bondholders, and to support the MTA's

transportation network.  It also states that the TBTA implemented cashless tolling for public

policy reasons, including traffic reduction, improved safety and environmental benefits.

Owens's failure to pay crossing tolls required the TBTA to expended resources to collect the

unpaid tolls.  More broadly, in the context of discussing parking tickets and related penalties,

Judge Engelmayer has observed that even "small-scale disregard" that "may not entail a great

degree of moral culpability" causes financial harm to public authorities.  <u>Tsinberg v. City of New

York</u>, 2021 WL 1146942, at *8 (S.D.N.Y. Mar. 25, 2021).  The TBTA asserts that it experienced

9,763,348 toll violations in 2020 and 12,353,893 violations in 2019.  (Bressler Dec. ¶ 9 & Ex. 3.)

"Without the ability to enforce timely compliance by scofflaws who might otherwise be

disinclined to pay up, [public authorities] would likely suffer substantial financial harms."

<u>Tsinberg</u>, 2021 WL 1146942, at *8.  Here, the volume and duration of Owens's non-compliance

similarly harmed the TBTA.

        <u>Conclusion.</u>  Applying the <u>Bajakajian</u> factors, the Court concludes that no

reasonable fact finder could conclude that Owens's average fine of  $18.61 per violation was

"grossly disproportional" to the underlying violation, given the duration and volume of his

violations and that the amount of each unpaid toll averages approximately $8.68 per crossing.

---

[7] Plaintiffs note that in deciding the motion to dismiss, the Court concluded that one plaintiff's payment of thirteen
fines of $100 each and one fine of $5 plausibly alleged payment of the maximum possible fine in thirteen instances.
<u>Farina</u>, 409 F. Supp. 3d at 202.  At the Rule 12(b)(6) stage, the Court's considers whether the non-conclusory factual
allegations plausibly allege a claim for relief.  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 680 (2009).  At the summary
judgment stage, however, the non-movant must "come forward with specific facts showing that there is a genuine
issue for trial."  <u>Powell</u>, 364 F.3d at 84.  The TBTA's internal worksheet expressly reflects a proportional reduction
of Owens's total fines, not the imposition of maximum fines authorized by law.

See Bajakajian, 524 U.S. at 336-37.  Indeed, the fines of $18.61 are relatively modest given the volume and duration of Owens's violations.  Owens's inattention to official mailings and the status of his E-ZPass account persisted for more than two years, during which time he made 439 toll crossings.  This resulted in harm to the TBTA, both in the revenue lost through unpaid tolls and the effort and expense to enforce the agency's tolling procedures against him.

The TBTA's summary judgment motion will be granted as to Owens's Excessive Fines claim.

### 2.  Owens's Assertions Concerning the Impoundment of His Car Does Not Defeat the TBTA's Motion.

Owens also asserts that "tow and storage fees" associated with the impoundment of his car violated the Excessive Fines Clause.  Owens states that he first learned of his tolling violations when law enforcement impounded his car as he exited the Queens-Midtown Tunnel on September 13, 2019.  (Pl. 56.1 ¶ 56.)  He states that he took immediate action when he learned of the violations, including retrieving his vehicle from an impound lot.  (Pl. 56.1 ¶ 59.)  In response to the TBTA's interrogatories, Owens stated that he "paid tow and storage fees of $1,339.16 to recover his car from the impound lot."  (Morales Dec. Ex. 2 ¶ 8.)

Owens points to no evidence that the "tow and storage fees" operated as a fine.  His interrogatory responses indicate that the DMV, and not the TBTA, was responsible for the expenses associated with the car's impoundment.  (Id. ¶ 11 ("In late September or early October 2019, Plaintiff went to the NY DMV . . . to re-register his car, receive new plates, and recover his vehicle from the impound lot. Plaintiff had various communications with the NY DMV during that time."); id. ¶ 2 (referencing "various oral communications with the NY DMV and impound lot to recover Plaintiffs' vehicle from impound, re-register the vehicle, and confirm payment of impound lot fees.").

- 24 -

**SPA-25**

Drawing every reasonable inference in favor of Owens as the non-movant, he has not pointed to evidence that would permit a reasonable trier of fact to conclude that the impound fees violated the Excessive Fines Clause, or even that they are attributable to the TBTA.

### C. Defendants' Summary Judgment Motions Will Be Granted as to Rojas's Eighth Amendment Claim.

#### 1. The TBTA's Fines of $17.56 per Violation Were Not Grossly Disproportional to the Underlying Violations.

The TBTA initially assessed $4,000 in violation fees against Rojas, in connection with 41 toll violations between February 2017 and January 2018.  (TBTA 56.1 ¶ 5; Pl. 56.1 Resp. ¶ 5.)  Her unpaid tolls totaled $381.50.  (Id.)  In September 2019, Rojas paid $720 to resolve all outstanding violation fees.  (TBTA 56.1 ¶ 8; Pl. 56.1 Resp. ¶ 8.)  Accordingly, Rojas paid $720 in fines, in connection with $381.50 in unpaid tolls.  Each fine had an average amount of approximately $17.56, and the average amount of each unpaid toll was approximately $9.30. The fines that Rojas paid to the TBTA reflects a multiplier of approximately 1.89 against each unpaid toll.

Factor 1: The essence of the violation and its relationship to other prohibited activity.  The essence of Rojas's violation is similar to Owens's, although it varies in certain details.  It is undisputed that the fines were assessed because Rojas did not pay Tolls by Mail bills, and, in one instance, because an invalid E-ZPass tag was used by her vehicle.  (TBTA 56.1 ¶ 6; Pl. 56.1 Resp. ¶ 6.)  The TBTA mailed notices of violation to an address for Rojas that it obtained through the DMV.  (Bressler Dec. Ex. 22 at 827.)  In responding to requests to admit, Rojas confirmed that she did not file an updated address with the DMV until April 2018, and that she had moved from an address in College Point, Queens to Maspeth, Queens in or about August 2015.  (Morales Dec. Ex. 9, Responses 2, 12.)   Rojas testified in her deposition that her husband

had used her car without permission and that she had not received Tolls by Mail bills.  (Rojas

Dep. 41, 43-54, 89, 118-19.)

Drawing every reasonable inference in favor of Rojas as the non-movant, the

essence of her violation was a failure to make timely payments for toll crossings due to her

inattention.  In Rojas's case, she failed to update her address with the DMV after she moved in

2015.  There is no suggestion that Rojas willfully evaded tolling procedures or otherwise

intended to defraud the TBTA.  Accepting Rojas's description of events, the tolls arose when her

husband used her car without permission, and she did not receive notice of violation because she

failed to timely update her home address.

Factor 2: Whether Rojas fits into the class of persons for whom the violation fees

were principally designed.  There is no dispute that as the owner of a vehicle that traversed a

crossing without paying the required tolls, Rojas falls into the class of persons for whom the

violation fees were designed.

Factor 3: The maximum fine that could have been imposed.  Rojas was assessed

tolls for crossings at the Robert F. Kennedy Bridge, the Verrazano Narrows Bridge, the Queens

Midtown Tunnel and the Throgs Neck Bridge.  (Bressler Dec. Ex. 24.)  TBTA regulation

imposes a fine of $100 upon the owner of any vehicle that "violates toll collection regulations" at

these crossings.  21 N.Y.C.R.R. § 1021.3(b).  Here, Owens paid a fine of approximately $17.56

for each violation.

As to the role of the TBTA's Fee Matrix, the Court's previous discussion of

Owens also applies to Rojas.

Factor 4: The nature of harm caused by Rojas's conduct.  For the purposes of

weighing the Bajakajian factors, the nature of harm caused by Rojas was identical to the harm

- 26 -

caused by Owens: her non-payment of tolls deprived the TBTA of needed revenues, and it required the TBTA to expend resources to collect the unpaid tolls.

   Conclusion.  Applying the Bajakajian factors, the Court concludes that Rojas's fines were excessive under the Eighth Amendment.  Rojas did not receive Tolls by Mail bills because she waited nearly three years to update her home address with the DMV.  After initially demanding $100 per violation, Rojas's fee-per-violation was ultimately reduced to $17.56.  No reasonable jury could find that Rojas's average fine of $17.56 was "grossly disproportional" to the gravity of her underlying violation.  See Bajakajian, 524 U.S. at 336-37.

   The TBTA's summary judgment motion will be granted as to Rojas's Excessive Fines claim.

     2. The Port Authority's Fines of $37.50 per Violation Were Not Grossly Disproportional to Rojas's Underlying Violations.

   The Port Authority initially assessed $1,600 in violation fees against Rojas, in connection with 32 incidents in which her vehicle crossed the George Washington Bridge without paying tolls.  (PA 56.1 ¶¶ 17, 20; Pl. 56.1 Resp. ¶¶ 17, 20.)  Her unpaid tolls totaled $480.  (PA 56.1 ¶ 20.)  On or about June 18, 2019, Rojas paid $1,200 to resolve all outstanding Port Authority fees, and paid $360 to resolve her outstanding tolls.  (PA 56.1 ¶ 26; Pl. 56.1 Resp. ¶ 26.)  Thus, Rojas paid to the Port Authority 75% of what was initially demanded of her, for both her tolling charges and her violation fees.  Each fine had an average amount of $37.50 and the average amount of each toll paid was $11.25.  The fines that Rojas paid to the Port Authority reflects a multiplier of 3.33 against the tolls amount that she actually paid.

   Factor 1: The essence of the violation and its relationship to other prohibited activity.  The essence of Rojas's violation of the Port Authority's toll procedures is identical to her violation of the TBTA's toll procedures.  Additionally, the Port Authority notes that the

Terms and Conditions of the agreement governing E-ZPass use requires users to file updated

address information following a move.  (Kromm Dec. Ex. 14 at Item 13.)  It also notes that

sections 505(5) and 509(8) of the New York Vehicle and Traffic Law require driver's license

holders to advise the DMV in writing of any address change.  As with the TBTA, Rojas's failure

to pay tolls owed to the Port Authority was a product of inattention, and there is no suggestion

here that Rojas willfully refused to pay tolls or attempted to evade payment obligations.

 Factor 2: Whether Rojas fits into the class of persons for whom the violation fees

were principally designed.  Again, there is no dispute that as the owner of a vehicle that traversed

a crossing without paying the required tolls, Reese falls into the class of persons for whom the

violation fees were designed.

 Factor 3: The maximum fine that could have been imposed.  The Port Authority

assessed tolling violations for crossings at the George Washington Bridge.  The Port Authority

imposes a fine of $50 for the non-payment of a toll.  Here, Rojas resolved her outstanding fines

with a payment in the average amount of $37.50 per fine.  It is also relevant that the Port

Authority agreed to resolve her outstanding tolls with a payment of $11.25 per toll, instead of the

$15 tolls required at the crossings.

 Factor 4: The nature of the harm caused by Rojas's conduct.  For the purposes of

weighing the Bajakajian factors, the nature of harm caused by Rojas was identical to the harm

that she caused to the TBTA: her non-payment of tolls deprived the Port Authority of needed

revenues, and it required the Port Authority to expend resources to collect the unpaid tolls.

 Conclusion. For the reasons already explained concerning the TBTA, the Court

concludes that no reasonable jury could conclude that Rojas's fines are excessive under the

Eighth Amendment.  Her fines of $37.50 were higher than the $17.56 average that she paid to the

TBTA, but a fine in this amount is reasonably within the discretion of the Port Authority, and is not "grossly disproportional" to the gravity of the underlying violation of failing to timely pay $15 tolls.

The Port Authority's summary judgment motion will be granted as to Rojas's Excessive Fines claim.

3. Defendants' Summary Judgment Motions Will Be Granted as to Reese's Eighth Amendment Claim.

1. The TBTA's Fines of $50 per Violation Were Not Grossly Disproportional to Reese's Underlying Violations.

The TBTA initially assessed $1,000 in violation fees against Reese, in connection with 10 toll violations between August 2018 and November 2018. (TBTA 56.1 ¶ 9; Pl. 56.1 Resp. ¶ 9.) Her unpaid tolls totaled $85. (Id.) In September 2019, Reese paid $500 to resolve all outstanding violation fees. (TBTA 56.1 ¶ 12; Pl. 56.1 Resp. ¶ 12.). Accordingly, Reese paid $500 in fines in connection with $85 in unpaid tolls. Each fine had an average amount of $50 and the average amount of each unpaid toll was $8.50. The fines that Reese paid to the TBTA reflects a multiplier of approximately 5.88 against each unpaid toll.

Factor 1: The essence of the violation and its relationship to other prohibited activity. The essence of Reese's violation is somewhat different than those of Rojas and Owens. A vehicle belonging to Reese traversed TBTA crossings while affixed with an E-ZPass tag that was registered to an individual who she has described as her best friend. (TBTA 56.1 ¶ 10; Pl. 56.1 Resp. ¶ 10.) The notices of violation sent from the TBTA to Reese stated that an invalid E-ZPass tag was used in a vehicle registered to her, and that the tag had a negative balance, was suspended, revoked, reported lost or stolen, or was an "Unregistered on-the-go Tag." (Bressler

Dec. Ex. 33.)  Reese testified at her deposition that her friend sometimes borrowed her car in order to take children on play dates to places like Dave and Buster's.  (Reese Dep. 51-52.)

Reese also testified at her deposition that she had not updated her address after she had moved, and had not noticed that she had stopped receiving Tolls-by-Mail mailings following her move.  (Reese Dep. 47-49 ("I definitely know that I did not update any address with the DMV.  I did not know.  Every time I move I never update it.  So I wasn't aware that that was something that people do.").)

There is no suggestion that Reese or her friend intended to defraud or deceive the TBTA when Reese's friend used his own E-ZPass tag on Reese's vehicle.  There is also no suggestion that Reese was intending to evade or avoid correspondence when she failed to update her address.  Drawing every reasonable inference in favor of Reese as the non-movant, the essence of her violation stemmed from inattention or a misunderstanding of both E-ZPass rules and the status of her current address on file with the DMV.

Factor 2: Whether Reese fits into the class of persons for whom the violation fees were principally designed.  There is no dispute that as the owner of a vehicle that traversed a crossing without paying the required tolls, Reese falls into the class of persons for whom the violation fees were designed.

Factor 3: The maximum fine that could have been imposed.  The TBTA assessed tolling violations for crossings at the Bronx Whitestone Bridge and the Robert F. Kennedy Bridge.  (Bressler Dec. Ex. 33.)  TBTA regulation imposes a fine of $100 upon the owner of any vehicle that "violates toll collection regulations" at these crossings.  21 N.Y.C.R.R. § 1021.3(b).  Here, Reese paid a fine of $50 for each violation.  As to the role of the TBTA's Fee Matrix, the Court's previous discussion of Owens also applies to Reese.

- 30 -

Factor 4: The nature of harm caused by Reese's conduct.  For the purposes of weighing the Bajakajian factors, the harm in Reese's case arose when a vehicle registered to her traversed the TBTA's tolled crossings using an E-ZPass tag that belonged to a third party.  The notices of violation state that the tag had either a negative balance or that its status was suspended, revoked or unregistered.  Again, there is no suggestion of any intent to defraud or malfeasance on the part of Reese or her friend, but her vehicle's use of a third party's E-ZPass tag raised a potential risk that the E-ZPass tag could have been used fraudulently or without permission.  Reese's failure to update her address complicated the TBTA's task of collecting the unpaid tolls and resolving the violations.

Conclusion.  Applying the Bajakajian factors, the Court comfortably that no reasonable jury could conclude that Reese's fines are excessive under the Eighth Amendment.  Her fines were assessed because a vehicle registered in her name traversed crossings using a third party's E-ZPass tag, and the TBTA's efforts to collect unpaid tolls and communicate the notices of violation were complicated because Reese failed to update her address after she moved.  The fines were reduced to $50 per violation after the TBTA initially demanded payments of $100 per violation.  Given the essence of the violation and the nature of the harm, no reasonable fact finder could find that Reese's fines in the average amount of $50 were "grossly disproportional" to the gravity of her underlying violations.  See Bajakajian, 524 U.S. at 336-37.

The TBTA's summary judgment motion will be granted as to Reese's Excessive Fines claim.

**SPA-32**

2.  The Port Authority's Fines of $25 per Violation Were Not Grossly
Disproportional to Reese's Underlying Violations.

The Port Authority initially assessed $1,700 in violation fees against Reese, in connection with 40 toll violations between 2017 and 2020.  (PA 56.1 ¶ 27, 29; Pl. 56.1 Resp. ¶¶ 27, 29.)  Her unpaid tolls totaled $606.  (PA 56.1 ¶ 29; Pl. 56.1 Resp. ¶ 29.)  In September 2019, Reese paid $1,000 to resolve all outstanding violation fees and $311.25 to resolve her unpaid tolls.  (PA 56.1 ¶ 33; Pl. 56.1 Resp. ¶ 33.)  Each fine had an average amount of $25 and the average amount she paid for each toll was approximately $7.78.  The fines that Reese paid to the Port Authority reflects a multiplier of approximately 3.21 against paid tolls averaging $7.78.

Factor 1: The essence of the violation and its relationship to other prohibited activity.  The Court discussed the essence of Reese's violations in connection with the fines that she paid to the TBTA.  Again, there is no suggestion that Reese or her friend intended to defraud or deceive the Port Authority when Reese's friend used his own E-ZPass tag on Reese's vehicle, or that Reese willfully intended to evade correspondence from the Port Authority.

Factor 2: Whether Reese fits into the class of persons for whom the violation fees were principally designed.  Again, there is no dispute that as the owner of a vehicle that traversed a crossing without paying the required tolls, Reese falls into the class of persons for whom the violation fees were designed.

Factor 3: The maximum fine that could have been imposed.  Reese paid fines in the average amount of $25, against the maximum permitted fine of $50 set by the Port Authority.

Factor 4: The nature of harm caused by Reese's conduct.  The harm caused by Reese's vehicle crossings at the George Washington Bridge are identical to the harms caused when her vehicle traversed crossing overseen by the TBTA.

<u>Conclusion.</u>  Applying the <u>Bajakajian</u> factors, the Court concludes that no reasonable fact finder could conclude that Reese's fines are excessive under the Eighth Amendment.  It is notable that the Port Authority not only reduced her fines from a maximum of $50 per incident to $25 per incident, but also reduced its demand for the payment of tolls from $606 to $311.25.  Given the essence of the violation and the nature of the harm, no reasonable finder of fact could conclude that Reese's fines of $25 were "grossly disproportional" to her underlying violations.  <u>See</u> <u>Bajakajian</u>, 524 U.S. at 336-37.

The Port Authority's summary judgment motion will be granted as to Reese's Excessive Fines claim.

IV.   <u>Plaintiffs' Unjust Enrichment Claim against the TBTA Will Be Dismissed.</u>

Plaintiffs assert a claim of unjust enrichment against the TBTA but not against the Port Authority.  The TBTA moves for summary judgment in its favor.  The motion will be granted.

"The elements of a cause of action to recover for unjust enrichment are '(1) the defendant was enriched, (2) at the plaintiff's expense, and (3) that it is against equity and good conscience to permit the defendant to retain what is sought to be recovered.'"  <u>GFRE, Inc. v. U.S. Bank, N.A.</u>, 130 A.D.3d 569, 570 (2d Dep't 2015) (quoting <u>Mobarak v. Mowad</u>, 117 A.D.3d 998, 1001 (2d Dep't 2014).  "'The essential inquiry in any action for unjust enrichment or restitution is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered.'"  <u>Id.</u> (quoting <u>Paramount Film Distrib. Corp. v. State of New York</u>, 30 N.Y.2d 415, 421 (1972)).

For the reasons discussed, the Court concludes that the fines paid by plaintiffs to the TBTA were not grossly disproportional, and therefore did not violate the Excessive Fines

**SPA-34**

clause of the Eighth Amendment.  Indeed, the fines were well below the maximum amounts set by statute and regulation and fall within the discretion afforded to the TBTA and Port Authority. Plaintiffs urge that their unjust enrichment claim should nevertheless proceed because plaintiffs paid the fines under economic duress and in the face of potentially paying significantly higher fines.  This argument is without merit.  As discussed, the fines paid were reasonable in light of the underlying tolls and the harms caused by plaintiffs' non-payment.  Plaintiffs have not articulated how as a matter of law defendants' retention of the fines would be against equity and good conscience.

The TBTA's summary judgment motion will be granted as to plaintiffs' unjust enrichment claim.

CONCLUSION.

Defendants' summary judgment motions are GRANTED as to plaintiffs' claims under the Excessive Fines Clause of the Eighth Amendment.  The TBTA's summary judgment motion is GRANTED as to plaintiffs' unjust enrichment claim.

The Clerk is respectfully directed to terminate the motions (Docket # 187, 191), enter judgment for the defendants, and close the case.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       March 10, 2022

## SPA-35

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
MIRIAN ROJAS, BRIAN OWENS and
KORISZAN REESE,

                            Plaintiffs,

              -against-                                        18 **CIVIL** 1433 (PKC)

                                                                **JUDGMENT**

TRIBOROUGH BRIDGE AND TUNNEL
AUTHORITY and THE PORT AUTHORITY OF
NEW YORK AND NEW JERSEY,

                            Defendants.
------------------------------------------------------------X

          It is hereby **ORDERED, ADJUDGED AND DECREED:**  That for the reasons

stated in the Court's Opinion and Order dated March 10, 2022, Defendants' summary judgment

motions are GRANTED as to plaintiffs' claims under the Excessive Fines Clause of the Eighth

Amendment. The TBTA's summary judgment motion is GRANTED as to plaintiffs' unjust

enrichment claim. Judgment is entered for the defendants; accordingly, the case is closed.

**Dated:**  New York, New York

          March 11, 2022

                                                      **RUBY J. KRAJICK**
                                                _____
                                                      **Clerk of Court**
                                      **BY:**
                                                _____
                                                      **Deputy Clerk**

**SPA-36**

### Eighth Amendment to the Constitution of the United States

Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

§ 1983. Civil action for deprivation of rights [Statutory Text &..., 42 USCA § 1983

---

United States Code Annotated
    Title 42. The Public Health and Welfare
        Chapter 21. Civil Rights (Refs & Annos)
            Subchapter I. Generally

42 U.S.C.A. § 1983

## § 1983. Civil action for deprivation of rights [Statutory Text & Notes of Decisions subdivisions I to IX]

Effective: October 19, 1996
Currentness

<Notes of Decisions for 42 USCA § 1983 are displayed in multiple documents.>

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

**CREDIT(S)**

(R.S. § 1979; Pub.L. 96-170, § 1, Dec. 29, 1979, 93 Stat. 1284; Pub.L. 104-317, Title III, § 309(c), Oct. 19, 1996, 110 Stat. 3853.)

Notes of Decisions (6387)

42 U.S.C.A. § 1983, 42 USCA § 1983
Current through P.L. 117-168. Some statute sections may be more current, see credits for details.

---

**End of Document** © 2022 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works. 1